**C. W. MOORE, Appellant,**

v.

**LOCAL UNION NO. 89, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 13, 1962.

As Modified on Denial of Rehearing
May 4, 1962.

John Young Brown, Louisville, for appellant.

Ralph H. Logan, Louisville, Hardy, Logan & Tross, Newell N. Fowler, Memphis, Tenn., for appellees.

PALMORE, Judge.

This injunction suit brought as a class action by a member of a labor union questions the right of the union and the plaintiff's employer, Dealers Transport Company, to carry out the terms of a decision relating to job seniority rights. The decision in question was reached through the grievance procedure set forth in a contract between the union and the employer. The chancellor upheld the decision and denied relief.

Dealers Transport Company, of Memphis, Tennessee, and E & L Transport Company, of Detroit, Michigan, were competitors in the transportation of new automobiles and trucks from the Louisville assembly plant of the Ford Motor Company. With the development of multi-level or "piggy-back" railroad shipments they began to lose business, and Ford advised both companies that eventually there would be room for only one of them. Following discussions over a period of 1½ to 2 years it was agreed between Dealers and E & L that E & L would withdraw, leaving the Louisville field to Dealers. This arrangement does not involve the sale or transfer of any equipment, facilities, or other property, but an application has been made to the Interstate Commerce Commission for the transfer to Dealers of E & L's authority to make "secondary" runs out of Louis-ville. For this transfer Dealers is to pay a nominal consideration covering the expense of the transaction. There was and is no agreement between the companies calling for a transfer of any employees from one to the other.

Because of the increased competition from both rail and water shippers, Dealers and E & L decided also that it would be advisable for each of them to retrench by drawing its operations closer to home. So, at the same time the application was made for a transfer of E & L's secondary authority out of Louisville to Dealers, two other applications were submitted to the I.C.C., as follows:

(1) To authorize the sale and transfer to E & L of Dealers' initial authority out of Lorraine, Ohio, along with physical assets such as tractors, shop equipment, and terminal facilities there located.

(2) To authorize the sale and transfer to Dealers of E & L's secondary authority to serve New Orleans and Shreveport, Louisiana, and Jackson, Mississippi.

It was emphasized in the testimony that each of these proposed transfers is separate, none being contingent on either of the others. All are pending before the I.C.C.

Most if not all of the labor forces at both Dealers and E & L are members of Local Union No. 89, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, which in turn is "affiliated" with two autonomous but apparently interlocking organizations, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and the National Truckaway and Driveaway Conference. For convenience we shall refer to these three organizations as the Local Union, the International, and the National Conference.

The Teamsters Union, as it is commonly called, has represented the employees of E & L and its predecessors in business for over 20 years and has represented the Dealers employees since 1955 or 1956. The

National Conference, in behalf of its member local unions, is the exclusive representative of the employees for purposes of collective bargaining, and its standard contract for the period March 1, 1961, to February 29, 1964, printed in booklet form, has been separately executed by Dealers and by E & L. In each instance the agreement is signed by the Local, the National Conference, and the employer, but not by the International as such.

The standard contract secures job seniority rights to the employees. These rights are established, broadly speaking, on a terminal or local rather than a company-wide basis. For example, Article 4, Sec. 1, says: "Terminal seniority shall prevail at all times except as provided for in Article 4, Section 6, Subsection (b)2." The latter subsection provides that if a branch or terminal is closed or partially closed and its work transferred to another branch or terminal an employee transferring from one to the other shall go to the bottom of the seniority board for purposes of job selection but shall exercise his company seniority for lay-off purposes and all other contract benefits. When a new branch or terminal is opened a new seniority board is established, and an employee who transfers to it from another location loses his seniority rights at the old terminal at the end of 2 years. (In the case of Dealers, which established its Louisville terminal in 1955, there was a special exception under which the first 50 employees transferring from Memphis were permitted, for some reason not disclosed in the record, to carry with them their original seniority dates.)

The standard contract (Article 7, Section 2) further provides a grievance procedure under which "disputes" shall first be taken up between the employer and the local union involved. On their failure to agree the dispute is taken before a "Local Joint Committee" composed of both union and management representatives. If this committee cannot resolve the controversy it may be appealed to a body called the Automobile Transporters Joint Conference Committee (hereinafter called the Detroit committee), which consists of both labor and industry-wide management representatives. When this panel is unable to agree the matter must be submitted to further arbitration.

Though E & L is still operating in Louisville, in August of 1961, when this controversy developed, a shift of business from E & L to Dealers obviously was taking place. As E & L began to drop its men employment at Dealers increased. Some of the E & L men were taken on by Dealers, but as the layoffs at E & L accelerated it was inevitable that there would be no room at Dealers for any more. Then it was that two of the former employees of E & L filed with the Local Union a grievance claiming that they and other displaced employees of E & L were entitled to employment by Dealers through a merger of the respective seniority lists of the two companies.

Without taking the question up with Dealers (thereby omitting the first step in the grievance procedure), the Local Union submitted it to the Local Joint Committee, where, at the recommendation of one of its members, Paul Priddy, president of the Local Union, it was "deadlocked," meaning that the Local Joint Committee decided to pass the problem to the Detroit committee for solution. The Dealers employees were disturbed at this turn of events, but their apprehensions were allayed by assurances from Mr. Priddy's assistant that they were protected by their terminal seniority rights and were not in any trouble. Three of these men attended the Detroit hearing, where they expected their interests to be represented and upheld by Mr. Priddy. But, like the innocent little oysters who took the famous walk with the walrus, they were mistaken, for, according to the testimony of Dealers' personnel manager, when Mr. Priddy had suggested to the Local Joint Committee that the grievance be "deadlocked" and sent to Detroit he remarked "that he knew Mr. Hoffa's thinking on matters of this nature and that these men were going to be sandwiched in." (Mr.

Hoffa was president of the International, chairman of the National Conference, and chairman of the Detroit committee.)

When the grievance was called on the docket of cases being heard before the Detroit committee, Mr. Priddy, who also was one of the members of that tribunal, vacated the bench, as was customary for the committee members to do when their own cases were involved. At this time he informed the three Dealers employees, to their surprise and consternation, that he was going to take a stand in favor of merging the Dealers and E & L seniority boards. Representing the Local Union, he thereupon proceeded to state the grievance to the Detroit committee and successfully recommend its solution on that basis. The decision of the Detroit committee, announced a few days after the hearing, was to the effect that the seniority registers of Dealers and E & L at Louisville were to be merged within 30 days.

E & L's Louisville terminal evidently is older than that of Dealers, which was established in 1955. This means that by and large the E & L employees will have greater seniority in the event the merger of seniority boards stands. For example, even with the right of the first 50 Dealers men who came from Memphis in 1955 to retain their original Memphis hire-in dates, out of the first 200 men listed on the new board only 58 will be Dealers men. As a result, on November 25, 1961, just before this suit was filed, Dealers laid off 96 of its Louisville employees who were displaced by former employees of E & L.

The decision of the Detroit committee is being attacked in this case upon the ground that it is so unjust as to imply fraud, or, to put it another way, that it is arbitrary and therefore subject to judicial inquiry and disposition. Specifically, the court is asked to enjoin the Local Union, the International (though it was not, as such, a party either to the contract or the grievance proceedings), and Dealers from carrying into effect the decision of the Detroit committee.

Affected E & L employees were made defendants by amendment.

The question has been raised as to the amenability of International to process through service on the president of its affiliated Local Union. Since, however, International was not a party to the contract or the grievance proceeding we believe its connection with the controversy is insufficient to warrant any relief against it. Hence the judgment of dismissal as to International was correct and it is unnecessary to consider the jurisdictional point.

Appellant and his fellow-employees of Dealers rely heavily on one of the provisions of a special rider attached to the contract between Dealers and the Local Union. It reads as follows:

"The Louisville domiciled employees of the Employer shall have exclusive rights to all work originating at the Louisville Terminal."

■ This provision, or its progenitor, grew out of a controversy in Memphis in 1955, when the Memphis employees, during a slack period, sought to displace drivers of loads passing through Memphis from other points of origin. We agree with the chancellor that it is not dispositive of the problem that arose in this case. The real question was whether the E & L drivers are entitled to be employees of Dealers, and the Detroit committee ruled, in effect, that they were. If that is correct, then the rider provision had no more application to their employment than it would have to the hiring of a new employee from any other source.

The contract provision (Article 4, Section 5) on which the Detroit committee based its ruling to the effect that the E & L employees are entitled to employment by Dealers reads as follows:

"In the event that the Employer absorbs the business of another private, contract or common carrier, or is a party to a merger of lines, the seniority of the employees absorbed or affected thereby shall be de-

termined by mutual agreement between the employer and the Unions involved. Any controversy with respect to such matter shall be submitted to the joint grievance procedure."

It is the theory of the E & L employees that the transfer to Dealers of E & L's secondary runs out of Louisville constitutes an absorption of business and that under this clause Dealers is required to absorb the affected employees as well as the business. We cannot find any such meaning in the clause. It deals only with seniority, and not with initial employment. Unless and until the absorbing company agrees to take the employees of the company whose business is being absorbed no seniority problem is created, hence this provision of the contract can have no application. It does not require that the absorbing company take these employees, but only that if it does take them the question of seniority between the old and new employees will be worked out by agreement or else be submitted to the grievance procedure.

It must be remembered that even though Dealers and E & L have signed practically identical contracts with the same union, still they are separate agreements. These two employers, their respective employees, and the union are not all one big happy family living under the same tent. As we see it, the displaced E & L employees can have no greater right to employment by Dealers than they would possess if they belonged to a different union, or to no union at all. Note, for example, that the contractual provision just quoted mentions "the *Unions* involved." (Emphasis added.) Suppose that the E & L men were represented by a different union. Would they have any rights under this contract between Dealers and another collective bargaining agent? Surely not. Nor would it be possible for them to initiate a grievance directed toward a company with which they had never enjoyed an employer-employee relationship. They are strangers to the Dealers contract, and it was not made for their benefit.

██  Since Article 4, Section 5, had no application under the circumstances of this case we are of the opinion that the question was not arbitrable under the grievance procedure. Arbitrability is an issue of law, which may be determined judicially. See discussion in Harbison-Walker Refrac. Co. v. United Brick & C. Wkrs., Ky.1960, 339 S.W.2d 933. But even if it were otherwise, we find the decision of the Detroit committee to be so erroneous, and made under such circumstances, that it was arbitrary.

Before proceeding further let us clarify the position of Dealers, the employer, in this matter. It is neutral. Its relations with its employees have been highly satisfactory, and the year ending July 1, 1961, was its best year to date for efficiency as to accidents, cargo-damage, and the like. It has recognized all along that the real controversy here was within the union itself. It feels bound to honor the contract and the "decisions of all agents to the employees who legally work for us." At Detroit it took the position that it was up to the union to decide what to do with the employees. In its November 25 letters to the 96 displaced employees it specifically advised them that their dismissal was "necessary due to Union action whereby the decision was rendered" by the Detroit committee requiring absorption of the E & L seniority list. It seems clear that Dealers was scarcely a real party in interest to the grievance proceeding. The actual antagonists were the E & L men on the one hand and the Dealers men on the other, all union members.

██  Representing these two antagonistic interests was the same union. It is useless to say that the union did not "represent" anyone in the grievance proceeding. Common sense verifies the testimony in this case to the effect that the men looked to and depended on their union officials to espouse their rights. Otherwise, what legitimate business does a union have in such a proceeding? It would be equally unrealistic to hold that the Dealers employees had repre-

sentation before the Detroit committee through the presence of three of their number who made the trip with Mr. Priddy and his assistant. As one of them said, he was only a shop steward and was not prepared or qualified to make a presentation to the national grievance panel. So we have a situation in which two antagonistic interests were represented by the same advocate. This of itself is enough to destroy the traditional presumption in favor of an arbitration award. Moreover, we cannot overlook the fact that even the advocate must have had an interest of its own, in that the power and influence of the union stood to be enhanced by a decision permitting the employment and seniority of its members to cut horizontally across company lines. Under these particular circumstances the solution of the controversy under cloak of a spurious "grievance" against a virtually disinterested employer simply will not bear careful scrutiny, and when we view the erroneous decision of the Detroit committee against such a background we judge it as having been arbitrary and violative of natural justice. Any other conclusion would reduce these employees to the status of pawns instead of free men. So, even though it be considered that the Detroit ruling was made pursuant to Article 7, Section 2(d) of the contract, providing for arbitration of all questions of contract interpretation, it still cannot stand. This result is not in conflict but is consistent with the principles stated in Smith v. Hillerich & Bradsby Co., Ky.1952, 253 S.W.2d 629.

The most difficult question in this case is whether the complaint of the suing employee is within the exclusive jurisdiction of the National Labor Relations Board.

Section 10(a) of the Taft-Hartley Act, 61 Stat. 146 (1947), 29 U.S.C.A. § 160(a), empowers the NLRB "to prevent any person from engaging in an unfair labor practice * * * affecting commerce," subject to certain exceptions. Unfair labor practices are defined in Section 8 of the Act, 29 U.S. C.A. § 158. An examination of the latter section convinces us that the controversy in this case does not involve an unfair labor practice. Section 8(b) (2) makes it an unfair labor practice for a union "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3)." However, the latter subsection is confined to discrimination the purpose of which is "to * * * discourage membership in any labor organization." Obviously, this is not such a case. Whatever may have been the end result of the actions of the union and the employer, they were not motivated by any of the illicit objects and designs set forth in Section 8 of the Act as constituents of an unfair labor practice. As we see it, what we have here is not a labor dispute, but simply an action to construe and enforce a contract under which the complaining employee and his fellows have certain rights of tenure. By entertaining that action the courts of this state neither intend nor claim to exercise any jurisdiction in the field of national labor policy, which has been delegated by Congress exclusively to the NLRB. We find inferential support in that Congress has expressly authorized the federal courts to adjudicate suits for violation of labor contracts (29 U.S.C.A. § 185), which means that the enforcement of a contract is not within the ken of the NLRB merely because it involves a labor problem.

We recognize that if an activity is "arguably" subject to the Act "the States as well as the federal courts must defer to the exclusive competence" of the NLRB. San Diego Building Trades Council Millmen's Union v. Garmon, 1959, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775. However, we are not convinced that the question in this case is reasonably arguable.

Insofar as it dismissed the action against the International union the judgment is affirmed. Otherwise it is reversed with directions that a judgment be entered in accordance with this opinion.

MOREMEN and WILLIAMS, JJ., dissenting.