## AERONAUTICAL INDUSTRIAL DISTRICT LODGE 727 *v.* CAMPBELL ET AL.

No. 333. Argued January 31, 1949.—Decided June 20, 1949.

*Maurice J. Hindin* argued the cause and filed a brief for petitioner.

*Assistant Attorney General Morison* argued the cause for Campbell et al., individual respondents. With him on the brief were *Solicitor General Perlman, Paul A. Sweeney* and *Morton Hollander.*

*Robert H. Canan* submitted on brief for the Lockheed Aircraft Corporation, respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

We brought this case here, 335 U. S. 869, to resolve a conflict of views between two Courts of Appeals in their interpretation of the rights given to veterans of World War II by § 8 of the Selective Training and Service Act of 1940, as amended, 54 Stat. 885, 890, 58 Stat. 798, 50 U. S. C. App. § 308. Three veterans brought this suit for compensation for the period of a layoff while employed at Lockheed Aircraft Corporation, a respondent here. The facts controlling the legal claims of all three may be represented by the circumstances attending Kirk's employment and layoff.[1]

The petitioner, Aeronautical Industrial District Lodge No. 727, was the duly recognized collective bargaining agent of the employees at Lockheed Aircraft Corporation. In September, 1941, the Union had negotiated an agreement with Lockheed covering the range of subjects touching conditions of employment typical of such agreements in the aircraft industry. This agreement was in effect when Kirk was employed in August, 1942, by Vega Aircraft Corporation, which afterwards was merged with Lockheed. He joined the Union and has remained a member throughout this controversy. He left Lockheed two years later to enter the Army, from which he was honorably discharged in January, 1946, and was restored to his job at Lockheed in accordance with § 8 (a) of the Selective Service Act. 54 Stat. 885, 890, as amended, 50 U. S. C. App. § 308 (a). While Kirk was in military service his Union made a new agreement with Lockheed modi-

---

[1] One of the three veterans, James L. Campbell, withdrew from the Union on the first day of March, 1946, but this did not affect his status as an employee with the company. There is no contention that his withdrawal from the Union affects in any manner his rights under § 8 of the Act, or that withdrawal from the Union should cause a different result.

fying the terms of the 1941 agreement in various particulars. Crucial to the issue here was a change in the seniority provisions of the former agreement. The change provided that "Union Chairmen who have acquired seniority shall be deemed to have top seniority so long as they remain Chairmen."[2] In plain English this means that thereafter employees who served as

---

[2] The collective bargaining agreement signed in 1941, so far as seniority was concerned, provided:

"In case of a slack in production, layoffs are to be made primarily on the basis of the principle of seniority. Due consideration will be given, however, to (a) knowledge, training, ability, skill and efficiency, and (b) deportment record and other factors. If it becomes necessary to reduce the working force in any plant or department, a plan of layoff procedure will be prepared by the management and submitted to the Union for approval. If such plan is not acceptable to the Union the Company agrees· to enter negotiations with the Union and to attempt to arrive at a mutually agreeable plan. If, however, at the end of one working week from the date the Company submitted its original plan of layoff procedure to the Union no new plan has been mutually agreed to, the Company may proceed according to its proposed plan of layoff subject to Article II, Section 6." 1941 Agreement, Art. III, § 5.

The later agreement provided:

"(A) General Layoff Procedure. Layoffs shall be made in order of Company-wide seniority applied by occupation where ability, skill and efficiency are substantially equal. However, in the case of employees with four years' or more seniority, the Company may, in its discretion, retain them in order of their Company-wide seniority, regardless of occupation, where ability, skill and efficiency are substantially equal. Any claim of unjust discrimination in the exercise of such discretion may be taken up as a grievance. Employees who have not acquired seniority rights may be laid off without regard to relative length of service.

.        .        .        .        .

"(D) Top Seniority for Union Chairmen for Purpose of Layoffs. For the purpose of applying the Temporary and General Layoff Procedures, Union Chairmen who have acquired seniority shall be deemed to have top seniority so long as they remain Chairmen. . . ." 1945 Agreement, Art. IV, § 3 (A), (D).

union chairmen were entitled to be retained in case of layoffs regardless of their length of service in the plant.

In the latter part of June, 1946, and within a year after Kirk's reemployment, it was necessary to lay off employees in Kirk's industrial unit. These layoffs followed the conventional sequence of seniority, time for military service being duly credited, with the exception that union chairmen were retained in accordance with the 1945 agreement, even though they had less time with the company than those who were laid off, veterans or not. Kirk was among those laid off, and the retention as union chairmen of men who were junior to him is the basis of his claim that § 8 of the Act had been infringed.[3] Kirk

---

[3] These are the relevant statutory provisions:

"(a) Any person inducted into the land or naval forces under this Act for training and service, who, in the judgment of those in authority over him, satisfactorily completes his period of training and service under section 3 (b) shall be entitled to a certificate to that effect upon the completion of such period of training and service, which shall include a record of any special proficiency or merit attained. . . .

"(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate, (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within ninety days after he is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—

"(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so;

"(c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be

was brought back to work within a month, but Lockheed refused to pay him for the time he was laid off. For this sum he brought this suit. Petitioner Union was allowed to intervene in order to protect its labor contract. Judgment went for Kirk, and the Union alone took the case to the Court of Appeals for the Ninth Circuit. That court affirmed the judgment,[4] 169 F. 2d 252, holding that § 8 of the Act forbade disregard of length of employment, so far as veterans are affected, in enforcing provisions in a collective agreement for the retention of union chairmen in the event of layoffs, regardless of their length of service. In so holding it ran counter to a series of decisions in the Court of Appeals for the Third Circuit. *Gauweiler* v. *Elastic Stop Nut Corp.*, 162 F. 2d 448; *Koury* v. *Elastic Stop Nut Corp.*, 162 F. 2d 544; *Di Maggio* v. *Elastic Stop Nut Corp.*, 162 F. 2d 546, and *Payne* v. *Wright Aeronautical Corp.*, 162 F. 2d 549.

It is of the essence of collective bargaining that it is a continuous process. Neither the conditions to which it addresses itself nor the benefits to be secured by it remain static. They are not frozen even by war. Thus, under the Act the veteran accumulates time toward his seniority while in the service; he also becomes the beneficiary of

---

considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration." 54 Stat. 885, 890, as amended, 50 U. S. C. App. § 308.

[4] Lockheed, the respondent in the District Court, did not appeal. But since the judgment was not merely for money damages but also involved the construction of the collective agreement, the Union had the right to appeal. *Fishgold* v. *Sullivan Drydock & Repair Corp.*, 328 U. S. 275, 281–84.

those gains the achievement of which is the constant thrust of collective bargaining. In other words, the Act gives him the status of one who has been "on furlough or leave of absence" but uninterruptedly a member of the working force on whose behalf successive collective agreements are made. In this way the Act protects the furloughed employee from being prejudiced by any change in the terms of a collective agreement because he is "on furlough," but he is not to be favored as a furloughed employee as against his fellows. This is the essence of our decision in *Fishgold* v. *Sullivan Drydock & Repair Corp.*, 328 U. S. 275.

In providing that a veteran shall be restored to the position he had before he entered the military service "without loss of seniority," § 8 of the Act uses the term "seniority" without definition. It is thus apparent that Congress was not creating a system of seniority but recognizing its operation as part of the process of collective bargaining. We must therefore look to the conventional uses of the seniority system in the process of collective bargaining in order to determine the rights of seniority which the Selective Service Act guaranteed the veteran.

Barring legislation not here involved, seniority rights derive their scope and significance from union contracts, confined as they almost exclusively are to unionized industry. See *Trailmobile Co.* v. *Whirls*, 331 U. S. 40, 53, n. 21. There are great variations in the use of the seniority principle through collective bargaining bearing on the time when seniority begins, determination of the units subject to the same seniority, and the consequences which flow from seniority. All these variations disclose limitations upon the dogmatic use of the principle of seniority in the interest of the ultimate aims of collective bargaining. Thus, probationary conditions must often be met before seniority begins to operate; sometimes it becomes retroactive to the date of employment; in other

instances it is effective only as from the qualifying date; in some industries it is determined on a company basis, in others the occupation or the plant is taken as the unit for seniority determination; sometimes special provisions are made for workers in key positions; and then again these factors are found in varying combinations. See Williamson & Harris, Trends in Collective Bargaining, 100–102 (1945); Harbison, Seniority Policies and Procedures as Developed through Collective Bargaining 1–10 (1941).

To draw from the Selective Service Act an implication that date of employment is the inflexible basis for determining seniority rights as reflected in layoffs is to ignore a vast body of long-established controlling practices in the process of collective bargaining of which the seniority system to which that Act refers is a part. One of the safeguards insisted upon by unions for the effective functioning of collective bargaining is continuity in office for its shop stewards or union chairmen. To that end provision is made, as it was made here, against laying them off merely on the basis of temporal seniority. Because they are union chairmen they are not regarded as merely individual members of the union; they are in a special position in relation to collective bargaining for the benefit of the whole union. To retain them as such is not an encroachment on the seniority system but a due regard of union interests which embrace the system of seniority rights.

These considerations are decisive of the case. The agreements made by the Union with Lockheed represent familiar developments in the process of collective bargaining which the Selective Service Act presupposes and in the context of which it must be placed. Kirk's rights, including seniority, before he entered the service were derived from the agreement of 1941. So, likewise, were his rights, including seniority, as an employee on fur-

lough defined by the agreement of 1945, inasmuch as that agreement in no wise disadvantaged his position because he was in the military service.

In the ordinary and orderly course of formulating the terms of employment, the 1945 agreement between the Union and Lockheed in some directions modified the provisions of the 1941 agreement. A labor agreement is a code for the government of an industrial enterprise and, like all government, ultimately depends for its effectiveness on the quality of enforcement of its code. Because a labor agreement assumes the proper adjustment of grievances at their source, the union chairmen play a very important role in the whole process of collective bargaining. Therefore it is deemed highly desirable that union chairmen have the authority and skill which are derived from continuity in office. A provision for the retention of union chairmen beyond the routine requirements of seniority is not at all uncommon and surely ought not to be deemed arbitrary or discriminatory.[5] The fact that it may involve, as in Kirk's case, the temporary layoff of a

---

[5] See Greenman, Getting Along With Unions 26 (1948); Union Agreements in the Cotton-Textile Industry, U. S. Dept. of Labor, Bull. No. 885, p. 28 (1946); Thomas, Automobile Unionism 56 (1941); Collective Bargaining Provisions, Seniority Provisions, U. S. Dept. of Labor 28–29 (1948); Collective Bargaining in the Office, American Management Assn., Research Rep. No. 12, p. 72. The advantage of this modification in seniority according to length of service in the plant is "the mutual interest of union and management in preserving the continuity of the bargaining and grievance adjustment personnel." Seniority Provisions in Union Agreements, U. S. Dept. of Labor, Serial No. R. 1308, p. 7 (1941). While there is not complete agreement on the advantage of seniority for union chairmen, it is certainly within the area of collective bargaining. See Williamson and Harris, Trends in Collective Bargaining 101–103 (1945); see Greenman, Getting Along With Unions 85–86 (1948). The National War Labor Board recognized "that the functions of

veteran while a nonveteran chairman with less time at the plant is retained, is wholly unrelated to the veteran's absence in the service. Under the 1945 agreement chairmen were to be elected once a year, and unless the election occurred on the day before a veteran returned to the plant, his chance of election would be the same as that of persons who had been continuously at work in the plant.

Of course, the Selective Service Act restricts a readjustment of seniority rights during the veteran's absence to the disadvantage of the veteran. But it would be an undue restriction of the process of collective bargaining (without compensating gain to the veteran) to forbid changes in collective bargaining arrangements which secure a fixed tenure for union chairmen, whereby veterans as well as nonveterans are benefited by promoting greater protection of their rights and smoother operation of labor-management relations.

All this presupposes, obviously, that an agreement containing the 1945 provisions expresses honest desires for the protection of the interests of all members of the Union and is not a skillful device of hostility to veterans. There is not the remotest suggestion that the 1945 agreement was other than what it purported to be—the means for securing both to veterans and to nonveterans better working conditions through elected leaders not subject to the contingencies of a labor turnover.

*Reversed.*

MR. JUSTICE DOUGLAS concurs in the result.

---

shop stewards and other local union officials were of value to a company as well as to its employees in settling and preventing labor grievances. For this reason, it usually directed seniority preference for union officials in disputes over the issue." The Termination Report of the National War Labor Board, U. S. Dept. of Labor, Vol. I, p. 148.