Joseph J. CONSEGLIO, George M. Hannan, Jr., Thomas J. Michaels, Robert J. Moretto, Denis J. O'Shaughnessy and Joseph F. Skelly, Plaintiffs,

v.

The PENNSYLVANIA RAILROAD COMPANY and Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes, Defendants.

United States District Court
S. D. New York.
Nov. 14, 1962.

Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, New York City, for plaintiffs, Thomas H. Baer, Asst. U. S. Atty., of counsel.

Conboy, Hewitt, O'Brien & Boardman, New York City, for defendant, The Pennsylvania RR Co., Edward F. Butler, Reginald Leo Duff, F. Sherwood Alexander, New York City, of counsel.

Joseph A. Marchetti, New York City, Allen S. Olmsted, 2nd, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for defendant, Brotherhood of Ry. and Steamship Clerks, Freight Handlers, Express and Station Employes.

WEINFELD, District Judge.

This is an action by six plaintiffs brought on their behalf by the United States Attorney under the provisions of the Selective Training and Service Act of 1940, as amended,[1] wherein they seek to obtain seniority status higher than that accorded to them by the defendant railroad upon their return from military service during World War II. The union of which they are members has also been named as a defendant.

The plaintiffs seek relief pursuant to section 8 of the Act,[2] which

---

[1] 54 Stat. 885 (1940), as amended (now Universal Military Training and Service Act, 62 Stat. 604 (1948), as amended, 50 U.S.C.App. § 451 et seq. (1958)).

As the relevant provisions of the Selective Training and Service Act of 1940 under which this suit is brought and the present Universal Military Training and Service Act are substantially the same, McKinney v. Missouri-K.-T. R. R., 357 U.S. 265, 271, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958), no distinction will be made between citing cases dealing with the earlier or later Act.

[2] 54 Stat. 890 (1940), as amended (now Universal Military Training and Service Act, § 9, 62 Stat. 614 (1948), as amended, 50 U.S.C.App. § 459 (1958)).

guarantees a re-employed veteran restoration to his former position without loss of seniority and entitles him to step back on the seniority escalator "at the precise point he would have occupied had he kept his position continuously during the war."[3] The Act, however, does not entitle the veteran to an increase in seniority over what he would have had as of right had he not gone into military service.[4] The defendants, plaintiffs' employer and their union, resist their claims, contending that the plaintiffs seek higher seniority status then that to which they are entitled.

Prior to military service in World War II, plaintiffs were employed in the baggage department of the defendant. Until May 1, 1942 their seniority and promotion rights were governed by a collective bargaining agreement in effect since February 16, 1935. Their job classification came within a group designated in that agreement as "Miscellaneous Forces," with seniority as of the date of entry in the service of the railroad. A separate agreement governed the seniority and promotion rights of the group of employees known as "Clerks." In general, Miscellaneous Forces' positions related to baggage work, whereas Clerks' positions were of a clerical nature, some of which required special skills such as ability to type, knowledge of stenography or training in bookkeeping.

The Miscellaneous Forces' employees, prior to May 1, 1942, had no right to transfer or to promotion to a Clerk's job. Those who applied for and were awarded Clerks' jobs acquired seniority on the Clerks' roster as of the date of the award, but forfeited their seniority on the Miscellaneous Forces' roster. In practical terms this meant that in the event of a reduction in force in the

Clerk's position to which such an employee had been appointed, he could not readily regain his prior Miscellaneous Forces' job.

On May 1, 1942 the defendant union, as the bargaining representative of both the Clerks' and Miscellaneous Forces' employees[5] entered into a single labor agreement, effective that day, covering both groups. Under its terms the employees were divided into two classifications, Group 1 and Group 2. In general, the former "Clerks'" jobs were included in Group 1 and the former "Miscellaneous Forces'" jobs in Group 2. Separate seniority rosters were provided for the two groups. Group 2 employees retained the same seniority dates as those which they previously had on the Miscellaneous Forces' roster.

A Group 2 employee still had no right of promotion or transfer to Group 1 jobs. A significant change, however, was that he could now bid for Group 1 jobs without loss of seniority on the Group 2 roster. In the event a qualified Group 2 employee bid for, and was awarded, a bulletined Group 1 job,[6] he acquired seniority on the Group 1 roster as of the date he first filled the job. He also retained and continued to accumulate his Group 2 seniority. Thus, unlike the situation which prevailed under the 1935 agreement, a Group 2 employee could achieve dual seniority. Again, in practical terms, this meant that in the event of a reduction in the Group 1 force, the former Group 2 man was in a position to regain his old job in that Group.

On January 23, 1943 the railroad and the union entered into an agreement, referred to as the "Military Service Agreement." This agreement, to be considered hereafter, is on its face a reiteration of the veteran's Federally protected rights under section 8 of the Act.

---

**3.** Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 284–285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946).

**4.** McKinney v. Missouri-K.-T. R. R., 357 U.S. 265, 272, 78 S.Ct. 1222, 2 L.Ed.2d 130 (1958). See Fishgold v. Sullivan Dry-

dock & Repair Corp., 328 U.S. 275, 285–286, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946).

**5.** Prior thereto the Miscellaneous group was represented by another union.

**6.** Absent a bid from a qualified Group 1 or a qualified senior Group 2 employee.

The plaintiffs, when furloughed for military service, were all in Group 2. Each plaintiff, after discharge from service, was re-employed by the defendant as a Group 2 employee with the same seniority date which he had prior to induction into the Armed Forces; ever since, each has been accorded his Group 2 seniority in conformity with that date.

■ In addition to their Group 2 seniority, the plaintiffs also achieved Group 1 seniority in consequence of a procedure which was adopted in connection with the Military Service Agreement—a procedure which was restricted to veterans. Shortly after his return to the service of the railroad, each plaintiff, as well as other Group 2 re-employed veterans, was afforded an opportunity to review the Group 1 jobs which had been bulletined and awarded during his absence in the military service to junior Group 2 employees or newly hired employees. Each plaintiff selected therefrom a job for which he was qualified, whereupon he was given a seniority date on the Group 1 roster immediately ahead of the junior man who filled the job. Plaintiffs all claim a higher date than that which they were granted as a result of this procedure, as shown by the following schedule: [7]

| Name | Group 1 Seniority | Date Now Claimed | Date Furloughed |
|---|---|---|---|
| O'Shaughnessy | 12/13/42 | 10/28/42 | 10/28/42* |
| Skelly | 8/10/42 | 7/ 9/42 | 7/ 9/42* |
| Hannan | 8/10/42 | 5/ 1/42 | 2/ 1/42 |
| Michaels | 8/10/42 | 5/ 1/42 | 2/ 1/42 |
| Moretto | 3/27/43 | 2/ 5/43 | 2/ 5/43* |
| Conseglio | 8/10/42 | 5/ 1/42 | 12/31/41 |

■ While the rights of the plaintiffs to protection against loss of seniority and promotion benefits by reason of military service derive from the Selective Training and Service Act, the collective bargaining agreements set the frame of reference in passing upon their claims, provided, of course, that such agreements do not contravene the Act.[8] Plaintiffs acknowledge, as indeed they must, that under the May 1, 1942 agreement, as Group 2 employees they had no right to promotion or transfer to the Group 1 jobs. Rule 2–A–2(a) thereof provided that with respect to new positions or vacancies that were bulletined, "fitness and ability being sufficient, seniority shall govern." A Group 2 employee who bid for a Group 1 position which had been bulletined was awarded it only if he were found qualified by management. Ability was considered prime and if an outside employee had the necessary qualification, he was appointed ahead of a Group 2 employee who bid for the bulletined position but did

7. Plaintiffs refer to provision 3–C–3(a) of the 1942 contract as discriminatory against veterans because it provides that "furloughed" employees will lose seniority if they are notified in writing of bulletined positions and fail to fill them within ten days. The short answer is that plaintiffs do not claim that the rule was invoked against them or that they lost any seniority by reason thereof. Second, it is clear that the provision applies only to employees "furloughed" in reduction of force and not to those "furloughed" for military service. The caption in the margin indicates that the former was its purpose and the evidence fully supports that view.

* There is a conflict in the evidence with respect to these furlough dates, but the Court finds them as set forth above.

8. See McKinney v. Missouri-K.-T. R. R., 357 U.S. 265, 268, 78 S.Ct. 1222 (1958); Aeronautical Industrial Dist. Lodge 727 v. Campbell, 337 U.S. 521, 526, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949).

not have the requisite ability. Had each of these plaintiffs remained with the railroad and not served in the Armed Forces, he would not have acquired Group 1 seniority except by applying for and being awarded a Group 1 job for which, in management's judgment, he was qualified. Since promotion from Group 2 to Group 1 involved a question of managerial judgment, there was no automatic progression under the 1942 agreement. The Court also finds that had these plaintiffs continuously remained with the railroad there was no custom or practice whereby they would have been automatically advanced from Group 2 to Group 1. Thus plaintiffs' claims are barred under McKinney v. Missouri-K.-T. R. R., where the Supreme Court held: [9]

> "[A] veteran is not entitled to demand that he be assigned a position higher than that he formerly held when promotion to such a position depends, not simply on seniority or some other form of automatic progression, but on the exercise of discretion on the part of the employer."

■ Plaintiffs, however, contend that the McKinney case is no bar, since here they seek neither positions nor promotions, but rather to establish their seniority status which is a substantial "constituent of, but is different from, a right of promotion." This purported distinction centers principally about that feature of the May 1, 1942 agreement already noted, whereby a Group 2 employee who bid for a Group 1 job did not forfeit his seniority status on the Group 2 roster, whether he failed in his bid or was successful. The nub of their contention, as this Court understands it, is that this liberalized bidding provision favorably advanced Group 2 employees' "rights to promotion" by protecting them against the hazards of reduction of working forces. Accordingly, plaintiffs argue that while the May 1, 1942 agreement did not by express terms provide for automatic promotion or transfer to Group 1 positions, it did grant them a bidding opportunity for Group 1 jobs which they were prevented from exercising because they were in military service. Proceeding from this premise, they argue that since under the 1942 agreement seniority governs (the factors of fitness and ability being sufficient), seniority status is a substantial constituent of the "right to promotion" which they are entitled to have declared in this action as of the dates they seek because of the loss of opportunity to bid for the jobs and, as they contend, consequent deprivation of a right of promotion.

The broad thrust of their position, as distilled from the record, briefs and argument of counsel, is that the opportunity to bid for the Group 1 jobs "automatically accrued" in plaintiffs' favor. In the instance of the three plaintiffs who were in military service on the date of the agreement, it is urged that since their absence in military service foreclosed their bidding for Group 1 jobs, and since it cannot be ascertained when, had they been present when those positions were bulletined, they would have availed themselves of the right to bid, they are entitled to seniority dates on that roster which coincide with what they term the "accrual of the opportunity." This they fix as May 1, 1942, the effective date of the collective bargaining agreement. In the instance of the other three plaintiffs, the contention is that although in the employ of the railroad from May 1, 1942 until thereafter furloughed for military service, they were unaware of the agreement and each seeks his furlough date as the seniority date to reflect "the accrual of the automatic opportunity." In asking for seniority advancement to those respective dates, all plaintiffs assert they are entitled thereto, even though no position was open on those days and without regard to whether a position was bulletined.[10] This contention as to "automatic opportunity," "accrual of the automatic opportunity," "an opportunity incapable of quantification," or however

9. 357 U.S. 265, 272, 78 S.Ct. 1222 (1958).

10. Stenographer's minutes 24–27.

572

phrased by counsel, would equate the opportunity to bid for a Group 1 job without loss of Group 2 seniority to an absolute and automatic right of promotion. To accept their thesis would accord them advancement in seniority contrary to the terms of the 1942 agreement and to actual practice at the time they entered into military service. Thus plaintiffs would realize a higher seniority status than they ever could have achieved had they remained in the continuous employ of the railroad. Their argument goes even further than that advanced by the employee and rejected by the Courts of Appeals for the Fifth, Sixth and Eighth Circuits which have held that a "high" or a "strong" [11] probability of promotion was not a seniority or employment status enforceable under the Act.

The weakness of plaintiffs' position is perhaps best demonstrated by the claims of the three who were not furloughed for military service until after the May 1, 1942 agreement became effective. None of these three had bid for any Group 1 position which had been bulletined up to the time he left for military service and yet each claims seniority on that roster as of the day of furlough upon his contention that he was ignorant of the new bidding features of the May 1, 1942 agreement. Apart from the fact that the agreement was binding upon them whether or not they knew of its various provisions, it is clear that the liberalized terms thereof, which permitted Group 2 employees to bid for Group 1 bulletined positions without loss of their higher seniority on the Group 2 roster, was widely heralded among the employees as a substantial gain for them. The Court finds that in fact they were aware of their newly acquired right to bid for the Group 1 positions without loss of seniority. Having failed to bid for bulletined positions, these employees are seeking a higher seniority rung than they would have been entitled to had they remained with the railroad and not been in military service. Moreover, the assumption that all Group 2 employees, including those who were in service on May 1, 1942, would have bid for a Group 1 job which had been bulletined had they then been present, meets challenge from the factual situation. Due to war conditions, overtime work was much higher in the Group 2 category than in Group 1, and as a result the railroad experienced much difficulty in filling Group 1 positions. Many Group 2 men preferred to remain in that category and did not bid for Group 1 positions because of the greater overtime pay opportunities in Group 2.[12] Thus, neither the 1942 agreement nor established practice or custom at the time employees were inducted into the Armed Forces supports the plea of "automatic accrual of the opportunity" so as to entitle the plaintiffs to the advanced seniority they claim.[13]

Finally, the purported distinction between the "seniority status" here involved and the "right to promotion" of McKinney is illusory. The basic issue of McKinney concerned seniority. The principal difference in the relief sought in that case and in the instant one is that here plaintiffs seek solely a declaration

11. Horton v. United States Steel Corp., 286 F.2d 710 (5th Cir., 1961); Sularz v. Minneapolis, St. P. & S. S. M. R. R., 259 F.2d 122 (8th Cir., 1958); Bassett v. Texas & Pac. Ry., 258 F.2d 819 (5th Cir., 1958); Raulins v. Memphis Union Station Co., 168 F.2d 466 (6th Cir., 1948). See Tilton v. Missouri Pac. R. R., 306 F.2d 870 (8th Cir., 1962).

12. While it is true that Conner v. Pennsylvania R. R., 85 U.S.App.D.C. 223, 177 F.2d 854 (1949), cert. denied, 339 U.S. 919, 70 S.Ct. 622, 94 L.Ed. 1343 (1950), does suggest that this consideration is not relevant in determining the seniority status of returning veterans, there was a finding in that case that the requirement of qualification was "usually, if not universally, met by employees already in good standing in the freight service." 177 F.2d at 857–858. Moreover, the continued vitality of the Conner case in the light of McKinney v. Missouri-K.-T. R. R., 357 U.S. 265, 78 S.Ct. 1222 (1958) has been called into question. Tilton v. Missouri Pac. R. R., 306 F.2d 870, 876 (8th Cir., 1962).

13. See Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285–286, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946).

of rights, whereas in McKinney they sought both a declaration and an enforcement of rights, including back pay. The relief desired differs, the foundation of the relief remains the same.

Plaintiffs, however, seek to bolster their position by anchoring their argument to the 1943 Military Service Agreement. While they have stipulated they "do not claim any right in this action to adjudicate their contractual rights under the military service agreement," nonetheless they rely upon it and events in connection with it for probative support that the bidding opportunity under the May 1, 1942 agreement automatically accrued in their favor and was recognized as a substantial right to promotion. They emphasize that provision of the agreement which provides that a reemployed veteran shall be "restored to such position * * * *(including rights to promotion)* to which his accumulated seniority entitles him, all in accordance with the then existing rules of the scheduled agreement, the same as if he had remained in the [railroad's] service." (Emphasis supplied.)

This agreement applied solely to veterans. It states that it was entered into "pursuant to Federal legislation (i. e., Public Resolution No. 96, of the 76th Congress., and the Selective Training and Service Act of 1940)."

Reference has already been made to the circumstances under which plaintiffs and other Group 2 veterans acquired retroactive seniority on the Group 1 roster in addition to their Group 2 seniority. These seniority ratings were the result of the operation of the Military Service Agreement and came about in the following manner.

In January, 1946, when most of the veterans had returned to the railroad's employ, a bulletin was posted by the railroad to the effect that returning Group 2 employees would be afforded an oppor-

tunity to select a Group 1 position and "will be given seniority in Group–1 equal to and ranking ahead of a promoted junior Group–2 or Group–1 employe hired during his absence." The rehired veterans went or were sent to an assignment office in Jersey City and made their selections from bulletins which had been posted in their absence and which were made available to them. This was done informally and undoubtedly there was some confusion in the selection process.[14] A number of plaintiffs were called back several times for seniority adjustment, and finally received their present ratings which they seek to advance by this action.

The procedure adopted to implement the Military Service Agreement yielded more to plaintiffs and other Group 2 veterans than they were entitled to under the May 1, 1942 collective bargaining agreement which defined the terms and conditions of employment applicable to all employees. Those restored Group 2 men, who made selections from the bulletins at the assignment office, were granted Group 1 seniority ratings based upon the award of a single Group 1 job while they were in military service. The Group 1 seniority status of more than one Group 2 veteran was based upon the award of a single Group 1 job. The ratings were accorded without regard to the availability of Group 1 positions. Thus men achieved dual seniority on the basis of the award of a single job while they were in service. By way of example, in the instance of Group 2 civilians, in any bid for a Group 1 job, only the man who was awarded the job received seniority starting the day he entered upon his new duties. The unsuccessful Group 2 bidders (the civilian employees) received no seniority on the Group 1 roster. In contradistinction, if three Group 2 veterans, under the procedure employed following the posting of the notice to appear at the assignment office, selected a Group 1 job which had been awarded to a

14. The evidence indicates that some returning veterans junior to plaintiffs on Group 2 were awarded seniority ranking above them on Group 1, while other returning veterans senior to plaintiffs on Group 2 received placement junior to them on the Group 1 seniority roster.

junior Group 2 employee during their absence in service, all three, even though but one job was involved, received seniority status on the Group 1 roster ahead of the junior. This went much beyond the terms of the 1942 agreement or practice in effect when the men were inducted into service.

Thus, it is abundantly clear that plaintiffs here seek advancement in status beyond that to which they would have been entitled had they remained in the continuous employ of the railroad and indeed greater advancement than senior Group 2 employees who were not in the Armed Forces could have asserted as of right. The underlying purpose of the Act is to protect the rights of the returning veterans to the extent that they would have existed if they had not gone into military service. The veteran was not to be disadvantaged because of his absence in the military; however, he was not to be favored as against his fellow employee.[15]

Once again turning to the teaching of McKinney:[16]

"[The Act] does not assure him that the past with all its possibilities of betterment will be recalled. Its very important but limited purpose is to assure that those changes and advancements in status that would necessarily have occurred simply by virtue of continued employment will not be denied the veteran because of his absence in the military service. The statute manifests no purpose to give to the veteran a status that he could not have attained as of right, within the system of his employment, even if he had not been inducted into the Armed Forces but continued in his civilian employment."

The fact that the railroad granted to plaintiffs and other Group 2 veterans greater seniority than they were entitled to, and went beyond the requirements of the collective bargaining agreement of May 1, 1942, did not enlarge their rights thereunder or under the Act.[17] The only rights protected under the Act were those to which they were entitled had they continued in the employ of the railroad—rights which any employee similarly situated would have been entitled to. Whatever rights they may have under the Military Service Agreement, to the extent they purport to grant more than they were entitled to had they remained in the continuous employ of the railroad, while they may be enforceable as a matter of contract right, are not under the protection of the statute. Upon all the evidence, the conclusion is compelled that the plaintiffs have no enforceable right under the Act to the higher seniority status on the Group 1 roster which they seek to have declared by this action.

The defendants have prevailed upon the substantive aspects of the case, but it is desirable to consider their separate defense of laches.[18] It must be acknowledged at the very outset that the inordinate delay in the prosecution of the plaintiffs' claims and the further delay in bringing the case to trial presented problems of proof for the defendants. However, whether plaintiffs are to be taxed with responsibility therefor, so as to entitle the defendants to judgment without regard to the merits of plaintiffs' claim, is another matter. The disposition of the question involves equitable considerations rather than the application of any specific statute of limitation.[19]

---

15. Aeronautical Industrial Dist. Lodge 727 v. Campbell, 337 U.S. 521, 526, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949).

16. 357 U.S. 265, 271–272, 78 S.Ct. 1222 (1958).

17. McKinney v. Missouri-K.-T. R. R., 357 U.S. 265, 273, 78 S.Ct. 1222 (1958).

18. See Grillea v. United States, 229 F.2d 687 rev'd on other grounds on rehearing, 232 F.2d 919 (2d Cir., 1956).

19. See Leonick v. Jones & Laughlin Steel Corp., 258 F.2d 48 (2d Cir., 1958); Del-

The present seniority dates of the plaintiffs were fixed no later than April 20, 1946. Until July, 1949 none protested his seniority date either to the railroad or the union; the plaintiffs did nothing other than to discuss the matter among themselves. At that time the Bureau of Veterans' Reemployment Rights of the Department of Labor,[20] whose aid the plaintiffs and other veterans had enlisted, formally requested the defendant railroad to investigate the matter. In December, 1949, after an exchange of correspondence, the railroad took the position that it had received no protest from any plaintiff with regard to his Group 1 seniority rating and rejected their claims. Thereafter, and during 1950, a number of conferences were held among representatives of the Bureau of Veterans' Reemployment Rights, the defendants and several plaintiffs, in an effort to adjust the matter. All proved abortive. Finally, on November 29, 1950, the railroad reiterated its position that plaintiffs' rights, as well as those of all its returning veterans, had not been violated.

On June 20, 1951 plaintiffs' claims were referred by the Department of Labor to the United States Attorney for the Southern District of New York pursuant to the Act.[21] The Assistant United States Attorney who was in charge of the matter failed to file suit promptly. Despite repeated requests by several plaintiffs, this action was not commenced until October, 1954. Again for reasons which do not appear and have not been explained, the case was not brought to trial until April, 1962 and final submission was not made until the end of June, 1962.[22]

While it is true that plaintiffs themselves took no action for more than three years after their seniority dates were assigned, this delay has not been shown to have prejudiced the defendants. As to the subsequent delay attributable to the Assistant United States Attorney, it cannot be gainsaid that this did, in some measure, foreclose the defendants from a full presentation of all the facts attendant upon the selection by the men of their Group 1 seniority dates in the spring of 1946. However, the inaction of the Assistant United States Attorney, despite the efforts of the plaintiffs to goad him into action, cannot be attributed to them. After 1949 they did whatever they could to assert their rights. Since the unexplained delay in the commencement of the suit and the even more inexplicable failure to prosecute it, particularly since under the mandate of the statute a "speedy hearing"[23] was required, is not chargeable to the plaintiffs, it cannot serve as the basis for upholding the defense of laches. Accordingly, it is overruled.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

man v. Federal Products Corp., 251 F.2d 123, 127 (1st Cir., 1958); Reconstruction Finance Corp. v. Harrisons & Crosfield, Ltd., 204 F.2d 366, 370, 37 A.L.R.2d 1117 (2d Cir.), cert. denied, 346 U.S. 854, 74 S.Ct. 69, 98 L.Ed. 368 (1953).

20. 62 Stat. 618 (1948), as amended, 50 U.S.C.Appendix § 459(h) (1958) (formerly 54 Stat. 891 (1940), Selective Training and Service Act of 1940, § 8(g)).

21. 54 Stat. 891 (1940), Selective Training and Service Act of 1940, § 8(e) (now 62 Stat. 616 (1948), Universal Military Training and Service Act, § 9(d), 50 U.S.C.Appendix § 459(d) (1958)).

22. These references are not to the Assistant United States Attorney whose name is listed at the head of this opinion. He, from the time of his assignment to this case, prosecuted it with diligence, industry and ability.

23. 54 Stat. 891 (1940), Selective Training and Service Act of 1940, § 8(e) (now 62 Stat. 616 (1948), Universal Military Training and Service Act, § 9(d), 50 U.S. C.Appendix § 459(d) (1958)).