**George Lester BALL et al., Appellants,**

**v.**

**EASTERN COAL CORPORATION et al., Appellees.**

Court of Appeals of Kentucky.

March 24, 1967.

Rehearing Denied June 30, 1967.

Jean L. Auxier, Pikeville, Abishi C. Cunningham, Welch, W. Va., for appellants.

Julius Rather, Lexington, John M. Stephens, Stephens & Combs, Pikeville, Bert T. Combs, Lexington, George Richardson, Jr., Richardson & Hancock, Bluefield, W. Va., Albert S. Kemper, Jr., Bluefield, W. Va., for appellees Eastern Coal Corp.

Grant F. Knuckles, Pineville, J. Ervin Sanders, Pikeville, Sanders & Redwine, Harrison Combs, Washington, D. C., M. E. Boiarsky, Charleston, W. Va., H. B. Noble, Hazard, for appellees United Mine Workers.

PALMORE, Judge.

Appellants, 177 former employes of the appellee Eastern Coal Corporation (hereinafter Eastern), brought this suit for damages against Eastern and the appellee United Mine Workers of America (hereinafter UMW, or the union) claiming they were discharged in violation of their seniority rights under the National Bituminous Coal Wage Agreement of 1950, as amended, to which contract Eastern and UMW, as collective bargaining agent for its members, were parties.[1] After development of the

---

1. Pertinent sections of the contract provide as follows:

    "SENIORITY
    "1. Seniority in principle and practice shall be recognized in the industry.
    "2. In all cases where the working force is to be reduced, employees in each job classification at a mine with the least service, shall be laid off first."
    \* \* \* \* \*
    "8. Grievances under the seniority arrangements shall be handled in the usual way under the machinery of the contract providing for the consideration and disposition of grievances."
    \* \* \* \* \*
    "SETTLEMENT OF DISPUTES
    "Should differences arise between the Mine Workers and the Operator as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at any mine, there shall be no suspension of work on account of such differences, but an earnest effort shall be made to settle such differences immediately:
    "First: Between the aggrieved party and the mine management.
    "Second: Through the management of the mine and the Mine Committee.
    "Third: By a Board consisting of four members, two of whom shall be designated by the Mine Workers and two by the Operators.
    "Should the Board fail to agree, the matter shall be referred to an umpire selected by said Board. Should the Board be unable to agree on the selection of an umpire, he shall be designated by the International President of the United Mine Workers of America and the President of the Operators' Association affected. The decision of the umpire in any event shall be final.
    "District conferences may establish an intermediate board consisting of two (2) commissioners, one representing the Operators and one representing the Mine Workers with such power as said Conference may delegate.
    "Pending the hearing of disputes, the Mine Workers shall not cease work because of any dispute; and a decision reached at any stage of the proceeding shall be binding on both parties thereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement."
    \* \* \* \* \*
    "SETTLEMENT OF LOCAL AND DISTRICT DISPUTES
    "Should differences arise between the Mine Workers and the Operators as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifi-

dispositive facts through appropriate pleadings, stipulations and pretrial conference the trial court made findings of facts and conclusions of law and entered a summary judgment denying relief and dismissing the action on the merits.

In 1953 Eastern was operating coal mines in Pike County, including its Nos. 4, 8 and 7. Nos. 4 and 8 were connected by a trestle and operated as a single unit, all of the coal from both openings being processed through a central cleaning plant and tipple at the No. 8 entry. No. 7 was located some two miles away and had its own tipple. Employes at Nos. 4 and 8 belonged to the UMW Local 5737. Those at No. 7 belonged to Local 5729.

On May 17, 1953, Eastern completed an underground haulway connecting Nos. 7 and 8, abandoned its tipple at No. 7, and began transporting coal from No. 7 through the underground haulway and processing it through the central cleaning plant and tipple at No. 8. Since the UMW constitution provides that no mine shall be under the jurisdiction of more than one of its local unions, on June 16, 1953, District 17 of the union dissolved Local 5729 and transferred its members to Local 5737.

During the next several months Eastern laid off a number of the miners, and disputes arose concerning the manner in which seniority was being or should be determined. The employes who had been working at Nos. 4 and 8 prior to the physical consolidation with No. 7 took the position that the employes at No. 7 became "new men" whose seniority dated from May 17, 1953, in the same manner as employes who had transferred from No. 7 to Nos. 4 and 8 before the consolidation had become "new men" as of their transfer dates. Evidently this was the approach taken initially by Eastern and the Local Mine Committee of the union, but some of the dissatisfied men appealed to higher authority (District 17) within the union, and on November 2, 1953, the president, vice president and chief field representative of District 17 determined in effect that on May 17, 1953, for purposes of seniority Nos. 4, 8 and 7 had merged into a single mine and that all employes retained their respective seniority dates as of immediately before that event.[2] This decision was communicated to the Local Mine Committee by a letter dated November 2, 1953. The Local Mine Committee then took the matter up with Eastern, whereupon East-

cally mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences immediately.

"1. Between the aggrieved party and the mine managment.

"2. Through the management of the mine and the Mine Committee.

"3. Through District representatives of the United Mine Workers of America and a commissioner representative (where employed) of the coal company.

"4. By a board consisting of four members, two of whom shall be designated by the Mine Workers and two by the Operators.

"5. Should the board fail to agree the matter shall, within thirty (30) days after decision by the board, be referred to an umpire to be mutually agreed upon by the Operator or Operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall ex-

peditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and salary incident to the services of an umpire shall be paid equally by the Operator or Operators affected and by the Mine Workers.

"A decision reached at any stage of the proceedings above outlined shall be binding on both parties hereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement."

2. For convenience, we shall call the system contended for by the Nos. 4 and 8 miners the "mine seniority plan" as opposed to the "payroll seniority plan" decided upon by the union, that being the descriptive terminology used in appellants' brief. However, as hereinafter observed, the dovetailing of seniority lists upon consolidation of two mines into one is not inconsistent with our conception of a "mine seniority plan."

ern agreed to and did adjust its payroll accordingly. Thereafter, though Eastern continued its separate numerical designations of the various mine entries for the purpose of work assignments and inspection reports, and the union also continued to recognize such separate identities in its correspondence relating to safety inspections, for purposes of payroll and seniority they were and have been treated as one and the same mine.

Reductions in force at Eastern's operations in Pike County culminated in a substantial number of layoffs in March and April of 1954. Appellants were employes at Nos. 4 and 8 who were discharged pursuant to the payroll seniority plan, but whose names would not have been reached for discharge under their version of the mine seniority plan. In response to their protests Eastern's management advised them that Eastern had to "go along" with the officers of the local union. A committee representing appellants then requested the Local Mine Committee to file a grievance, but the Local Mine Committee took the position that no grievance existed and declined to do so. An appeal to District 17 asking that the Local Mine Committee be compelled to present formal grievances resulted in a decision by the executive board of District 17 on May 27, 1955, holding that the controversy had been properly resolved, and thus affirming the decision theretofore made by its officers and communicated to the Local Mine Committee in the aforementioned letter of November 2, 1953.

Being dissatisfied with the action of District 17, the aggrieved employes appealed to UMW, whose president appointed a commission composed of two members of the UMW executive board to make a report and recommendation. On November 16, 1955, the commission reported the facts of the controversy to the president and recommended that the opinion of District 17 be sustained.

On May 16 or 17, 1956, a committee representing the aggrieved employes appeared before the executive board of UMW at Washington, D. C., and was afforded a hearing on its appeal from the report and recommendation of the commission. After such hearing the UMW executive board affirmed the commission's recommendation.

Eastern did not take part in any of the proceedings within the UMW organization.

In this suit the appellants contend that Eastern has breached the contract and UMW has breached its fiduciary duties to them.

More specifically, as we understand it, the position of appellants is that the merger of the two seniority lists in the manner herein described violated their rights under the contract, that the union's determination of its propriety and Eastern's subsequent acquiescence amounted to an unauthorized amendment of the contract, and that the union's participation in this violation of their contract rights and its refusal to submit their complaint to the grievance procedure set forth in the contract constituted a violation of its fiduciary duty of fair representation as their bargaining agent.

Appellants rely heavily on a principle that in our opinion is no longer the law. That principle, stated and applied in Piercy v. Louisville & N. Ry. Co., 198 Ky. 477, 248 S.W. 1042, 33 A.L.R. 322 (1932), is that a labor union "is not the agent of the member for the purpose of waiving any personal right he may have, but is only his representative for the limited purpose of securing for him, together with all other members, fair and just wages and good working conditions," and does not have the authority to adjust or agree to a modification of his seniority rights under a contract between the union and the employer.

■ This action, though brought in a state court, comes within the ambit of § 301

(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185(a),[3] and is controlled by federal law. Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370, 378 (1964).[4]

In Aeronautical Indus. Dist. Lodge 727 v. Campbell, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1948), three former employees of Lockheed Aircraft Corporation brought suit against Lockheed challenging the validity, as to them, of an agreement between Lockheed and their union modifying the seniority provisions of a collective bargaining agreement that was in effect when the employes left the company to enter the military service. The right of each employe upon discharge from the service to restoration of his employment without loss of seniority was secured by § 8 of the Selective Training and Service Act of 1940, as amended. The contract modification agreed upon by the union and the employer during their absence in the military service "provided that 'Union Chairmen who have acquired seniority shall be deemed to have top seniority as long as they remain Chairmen.' In plain English this means that thereafter employees who served as union chairmen were entitled to be retained in case of layoffs regardless of their length of service in the plant." 337 U.S. at 523–524, 69 S.Ct. at 1288. In upholding the modification the court said:

"It is of the essence of collective bargaining that it is a continuous process. Neither the conditions to which it addresses itself nor the benefits to be secured by it remain static. They are not frozen even by war. * * *

"There are great variations in the use of the seniority principle through collective bargaining bearing on the time when seniority begins, determination of the units subject to the same seniority, and the consequences which flow from seniority. All these variations disclose limitations upon the dogmatic use of the principle of seniority in the interest of the ultimate aims of collective bargaining. * * *

"To draw from the Selective Service Act an implication that date of employment is the inflexible basis for determining seniority rights as reflected in layoffs is to ignore a vast body of long-established controlling practices in the process of collective bargaining of which the seniority system to which that Act refers is a part. * * *

"The agreements made by the Union with Lockheed represent familiar developments in the process of collective bargaining which the Selective Service Act presupposes and in the context of which it must be placed. * * *

"Of course, the Selective Service Act restricts a readjustment of seniority rights during the veteran's absence to the disadvantage of the veteran. But it would be an undue restriction of the process of collective bargaining (without compensating gain to the veteran) to forbid changes in collective bargaining arrangements which secure a fixed tenure for union chairmen, whereby veterans as well as nonveterans are benefited by promoting greater protection of their rights

---

3. § 301(a) of the LMRA does not exclude state court jurisdiction of suits for violation of labor contracts governed by federal law. Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483, 486 (1962).

4. "Textile Workers Union of America v. Lincoln Mills of Ala., 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, of course, has long since settled that § 301 has substantive content and that Congress has directed the courts to formulate and apply federal law to suits for violation of collective bargaining contracts." Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 269, 9 L.Ed.2d 246, 250 (1962). Cf. Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Company, 369 U.S. 95, 82 S.Ct. 571, 576, 7 L.Ed.2d 593, 598 (1962), holding that "incompatible doctrines of local law must give way to principles of federal labor law."

and smoother operation of labor-management relations.

"All this presupposes, obviously, that an agreement containing the 1945 provisions expresses honest desires for the protection of the interests of all members of the union and is not a skillful device of hostility to veterans. There is not the remotest suggestion that the 1945 agreement was other than what it purported to be—the means for securing both to veterans and to nonveterans better working conditions through elected leaders not subject to the contingencies of a labor turnover."

In Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1952), the Supreme Court upheld the authority under the National Labor Relations Act of a labor union to make a collective bargaining agreement with an employer giving its employes credit for pre-employment military service, to the prejudice of employes whose names had been on the seniority roster before they entered military service. Among the principles stated in reaching its conclusion the court said:

"Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

" * * * Seniority rules governing promotions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include differences based upon such matters as the *unit within which seniority is to be computed,* the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary. * *

"The National Labor Relations Act, as amended, gives a bargaining representative not only wide responsibility but authority to meet that responsibility." (Emphasis ours.)

We come now to Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the principles of which were held by the trial court to be controlling in this litigation. In that case two competing motor carriers, Dealers Transport Company and E & L Transport Company, divided territories. The employes of both were represented by the same union. As the shift in business in the Louisville area took place E & L began to lay off its employes there, and eventually those who otherwise could not have been absorbed by Dealers submitted to the local union a grievance in which they claimed the right to employment at Dealers through a merger of the respective seniority lists of the two companies. The dispute was carried through the contract-provided grievance procedure with the ultimate result that the E & L men prevailed. Though Dealers was a nominal party in the proceeding it "considered the dispute a matter for the union to decide" and was in substance a disinterested participant. 375 U.S. at 343, 84 S.Ct. at 368. Obviously it was the union that made the final decision in the proceeding.

This court, from which the appeal in Humphrey was taken,[5] was of the opinion that the contract rights of the Dealers employes had been violated and that by reason of the antagonistic interests between its

5. Moore v. Local Union No. 89, etc., Ky., 356 S.W.2d 241 (1962).

members the union was not in a position to give them fair "representation" in a grievance procedure. Our decision was reversed. On the first point, the Supreme Court placed a different construction from that reached by this court on a provision (§ 5) of the contract relating to seniority in the event of one employer's absorbing the business of another. On the second point, the Supreme Court found that the grievance proceeding was an adequate avenue through which the union could properly exercise its right and authority to resolve an issue between two sets of its members.

Appellants distinguish Humphrey v. Moore on the basis of the specific contract provision (§ 5) in that case. True, in a footnote (375 U.S. at 345, 84 S.Ct. at 369, fn. 7) the court expressly said, "We need not consider the problem posed if § 5 had been omitted from the contract or if the parties had acted to amend the provision." On the other hand, without that specific contract provision we think *Humphrey* may have presented a more serious question of contract violation, or to put it another way, the right of the union and the employer to amend the contract in the course of continuing collective bargaining, than does this case.

■ Our first conclusion is that the dovetailing of the seniority lists for Nos. 4 and 8 and No. 7 was neither a violation nor an amendment of the contract. When two mines become one they both lose their separate identities. Appellants would have it that only No. 7 lost its identity. It could be just as well argued the other way around. That the tipple is located at No. 8 does not alter the fact that Nos. 4, 8 and 7, being joined together in one operating unit, are now one mine. That is what the union decided, and if the question were before us on first impression, the union being denied any decision-making authority in the premises, that is what this court also would decide.

Hence it was not necessary to amend the contract.

■ But we need not construe the contract ourselves. Applying the federal law as we construe it from the principles stated in the Supreme Court opinions herein cited, there being neither fraud nor bad faith, as bargaining representative for its members the union had the right and power to resolve this purely intra-union problem and, in the course of so doing, to effect an agreement with Eastern either interpreting or amending the contract accordingly. If a bargaining representative may alter seniority rights secured both by contract and by statute, as in Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1952), surely it must follow that it may do so when the rights are secured by contract only.

Proceeding further, we hold that it was not necessary for the dispute to be resolved through the grievance process. Though such a procedure may be "adequate" to the purpose,[6] if the employer is willing to abide by the union's decision there is no practical reason for proceedings that require its further participation. Whether the ample opportunity actually afforded the appellants in this case to be heard within the structure of the union was legally necessary in order to validate an agreement already made between Eastern and the union may be doubtful, but we are not required to reach the question.

■ Lastly, we think it is quite clear that the union did not in any sense fail in its duty of fair representation. As the court said in *Humphrey* (375 U.S. at 349, 350, 84 S.Ct. at 371–372), "we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another. * * * Just as a union

6. Cf. Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), at 375 U.S. 351, 84 S.Ct. 372.

must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. Nor should it be neutralized when the issue is chiefly between two sets of employees. Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes."

The judgment is affirmed.

All concur.