Curtis H. WASHINGTON et al.,
Plaintiffs,

v.

CENTRAL OF GEORGIA RAILWAY
COMPANY et al., Defendants.

Civ. No. 711.

United States District Court
M. D. Georgia,
Macon Division.

June 27, 1958.

Rauh & Levy, by John Silard, Washington, D. C., Phillips & Mullis, by J. Taylor Phillips, Macon, Ga., for intervenors.

Julian C. Sipple, Asst. General Solicitor, Savannah, for Central of Georgia Railway.

Benning M. Grice, Macon, Ga., Russell B. Day, Cleveland, Ohio, for Brotherhood of Locomotive Firemen & Enginemen.

BOOTLE, District Judge.

The above action was instituted in this Court on December 12th, 1949, by a number of Negro firemen on the Central of Georgia Railway Company to strike down racial discrimination then practiced under the Southeastern Carriers' Conference Agreement of February 18th, 1941 limiting Negro firemen, euphemistically referred to therein as non-promotable firemen, to 50% in each class of service. The action accomplished its purpose in that on March 25th, 1952, Judge A. B. Conger signed a consent decree permanently enjoining all defendants, including the Central and the Brotherhood of Locomotive Firemen and Enginemen,

"(a) from enforcing the Southeastern Carriers' Conference Agreement of February 18, 1941, or any other written or oral agreements, or carrying on any practices under such agreements, insofar as said agreements or practices discriminate, on the ground of their race or color, against Negro firemen in their employment or occupation as firemen on steam locomotives, or as helpers on Diesel locomotives, or (b) from denying to plaintiffs or other members of their class their respective rights to assignments as firemen on steam locomotives or as helpers on diesel locomotives based upon seniority and qualifications because they are Negroes or because they have not been permitted or required to take or pass examinations to qualify as engineers * * *."

On December 18, 1957, Al Marshall, Major Simpson, Will Covington, Jim Mullins and Marion Vincent, five Negro firemen employed by the Central, filed their motion to intervene in said case and to be permitted to file their petition against the Central and the Brotherhood for a rule to show cause why they should not be held in civil contempt for certain alleged violations of said injunction. The intervention was allowed, the petition filed and rule to show cause issued.

The interveners have made the following showing. Their employment by Central antedates the injunction and they are entitled to the benefits thereof. The Brotherhood is their exclusive bargaining representative with the Central under the Railway Labor Act, 45 U.S.C.A. § 151 et seq. They are excluded from membership in the Brotherhood because of their color. Due to the long standing rule applicable on the Central that engineers must have experience as firemen and that Negroes may not become engineers, Negro firemen have become the senior firemen having the right to choice runs and all other rights accompanying high seniority. One of the choice runs on the Central is the freight run from Columbus, Georgia to Birmingham, Alabama on the Columbus Division. For 20 years or more prior to March, 1957, this run was worked for the most part by five Negro firemen with top seniority who shared its mileage. As of the time of the filing of this intervention these runs were held by the five interveners and their mileage averaged about 3760 miles in a 30 day month and 3610 miles in a

31 day month, the smaller mileage in the longer month being due to the men's being "held off" so as not to exceed the maximum of 3800 miles per month, as prescribed in the Schedule of Wages, Rules and Regulations hereinafter mentioned.

On or about March 1, 1957, pursuant to an agreement between the Brotherhood and the Central a "swing man" was added to this regular assigned run. He takes the fifth run of each man four times a month causing each of the five men to lose mileage and pay. Since the swing man has been added each of these five regular assigned jobs loses 628 miles per month representing a loss of pay of something like $100 per month for each man. Intervener Marshall testified that it reduced his monthly pay from approximately $650 to approximately $580.

Upon the basic facts above found the parties rest radically diverse contentions. Interveners say that in adding this swing man and in thus taking mileage and pay from them, the Brotherhood and the Central have flagrantly violated the injunctive decree of this Court in that they have thus been "enforcing * * * written or oral agreements [and] carrying on * * * practices [which] discriminate, on the ground of their race or color, against Negro firemen in their employment or occupation as firemen on steam locomotives or as helpers on diesel locomotives * * *."

The Central and the Brotherhood, on the other hand, emphatically deny both the alleged intent to discriminate and the alleged fact of discrimination.

Interveners' counsel succinctly outlined their contentions as follows: "We do not contend * * * that these outstanding Federal decrees [similar decrees were issued in other Courts] prevent any reduction in the pay and privileges of Negro firemen of any kind. Any reduction which is made equally across the board, affecting all, certainly is not a discrimination against Negro firemen. We do not claim that the injunctions have insulated these men in a position where they can come to a federal court and resist any type of reduction in their pay or mileage. That is certainly not what was intended, but we say that discriminatory reduction where we can show that the Negroes have been selected for the application of an adverse rule such as this one and that whites are not similarly subjected, that, we say, of course, is the exact discrimination which the very terms of the consent decree prohibit * * * I have thought about just what discrimination means, and what it takes to prove it, and I think what I mean in this case by discrimination is the selective—the racially selective application of reduction in job rights. That is what I mean, and I think that is what we intend to prove; the curtailments in the privileges and payment of jobs effected against Negroes but not against whites basically, and I think that is the kind of discrimination covered and the kind we will show has been effected in this case."

Interveners claim the existence of certain matters "in aggravation of this discriminatory reduction in their mileage", namely, that (1) they were "frozen" in these reduced mileage jobs and denied their contractual right to shift to another job; (2) this inroad upon their seniority privileges and pay and mileage was totally racially selective in the sense that no comparable reduction of the pay of white firemen was made on the Columbus division or other divisions of the Central; (3) their pay loss necessarily goes to white firemen and (4) a system of discrimination has been built into the railroad industry in that only white firemen were promotable to jobs as engineers; that thus an engineer, always a white man, may have seniority as a fireman, engineer, hostler and hostler helper, whereas a Negro fireman has seniority only as a fireman and that consequently a demoted engineer who is "back firing", in competition with interveners, has the possibility of supplementing his pay as a fireman with pay earned in another capacity, whereas such possibility is not open to interveners.

Counsel for the Brotherhood, after denying discrimination and discriminatory intent, deny also that interveners have a right to run a greater mileage per month than other firemen generally run and deny that adjusting their mileage to bring them in line with mileage run by other firemen constituted hostile discrimination in any legal sense of the word. The Brotherhood says further that this swing man was added in keeping with the Brotherhood's policy nationally and locally to spread the work among all employees for whom it acts as bargaining agent, and that this policy has been, and is being, applied indiscriminately not only to the Columbus division but to all divisions and districts of the Central and not only to Negro firemen but to white firemen as well.

The Central's position is that prior to March 1, 1957, Article 26, Section 2(a) and (f) of the Schedule of Wages, Rules and Regulations governing locomotive firemen read as follows:

"Seniority, Mileage and Promotion.

"Section 2. Reduction Of Firemen's Working Lists: When from any cause it becomes necessary to reduce the number of firemen on the firemen's working lists on any seniority districts, the following rules will apply:

"(a) No reductions will be made so long as those in assigned or extra passenger service are averaging the equivalent of 4,000 miles per month; in pooled, chain-gang freight or any other assigned service, paying freight rates are averaging the equivalent of 3,200 miles per month; on the road extra lists are averaging the equivalent of 3,200 miles per month; or those on the yard extra lists are averaging the equivalent of 32 days per month

\*　　\*　　\*　　\*　　\*

"(f) in the regulation of assigned or extra passenger service, a sufficient number of men will be assigned to keep the mileage or equivalent thereof within the limitations of 4,000 and 4,800 miles per month; in assigned, pooled, chain-gang or any other service paying freight rates,

a sufficient number of firemen will be assigned to keep the mileage or the equivalent thereof within the limitations of 3,200 and 3,800 miles per month. Neither the maximum nor the minimum is guaranteed.";

that due in part to dieselization, there has been a reduction in need for firemen and engineers, and by reason of this reduced need and in an effort to distribute the available work among as many as possible of the employees, both Negro and white, the Brotherhood petitioned the Central in accordance with the Railway Labor Act for a revision of the Article and Section above quoted so as to reduce from a minimum of 3,200 to a minimum of 3,000 the number of miles a fireman, be he white or Negro, in freight or any other assigned service paying freight rates would be entitled to make per month before there could be a reduction by the Central in the "firemen's working lists", the roster from which men for trains are taken according to seniority and entirely without regard to race; the Central, in good faith, consented to said request and, accordingly, Article 26, Section 2(a) and (f) was re-written, changing in Section 2(a) the figure 4,000 to 3,800, the figure 3,200 to 3,000 and in the last line thereof "32 days" to "26 days", and changing in Section 2(f) the figure 4,000 to 3,800 and the figure 3,200 to 3,000, this agreement having been entered into on February 21, 1957, to become effective March 1, 1957; under the amended agreement it was possible to add a swing man on the Columbus to Birmingham freight run without violating the new minimum of 3,000 miles per month; the addition of this swing man was also provided for in Section 2(h) of Article 26, which reads:

"(h) To keep within the mileage regulations set forth in this section, additional crews may be added or swing men used to relieve the regular men on specified days. If regulation cannot be made as provided herein, men will be required to lay off so that the equivalent of 4,800 miles in passenger service, or 3,800 miles

in other assigned service, will not be exceeded.";

the sixth, or swing man's, job was bulletined in accordance with the contract between the Central and the Brotherhood and has been filled strictly according to seniority and entirely without regard to an employee's race; and insofar as the Central is concerned the amended Article 26, Section 2(a) and (f) has been applied uniformly to all firemen, both white and Negro, wholly without discrimination against any employee or group of employees.

At the conclusion of the evidence, the Central moved to be dismissed as a party defendant upon the ground that there was no evidence tending to show any discriminatory acts by it. Interveners expressly consented that said motion be granted while the Brotherhood took no position with regard to said motion. Thereupon, the court entered an order exonerating the Central with regard to the contempt charges, but retaining it as a party defendant so that it would be subject to such further order or orders as may be entered in the case.

Under the law, the burden is on the moving party to show the facts necessary to establish contempt. This burden must be carried by clear and convincing evidence. While proof beyond a reasonable doubt is not required, the authorities sometimes say that more than preponderance of proof is required. "Whatever qualifying adjective may be used in the various opinions, they are unanimous that a heavy burden of proof rests upon the party urging contempt." Kansas City Power & Light Co. v. National Labor Relations Board, 8 Cir., 1943, 137 F.2d 77, 79; 15 Cyc.Fed.Pro. Sec. 8787 (3d ed. 1953). Added to the burden above outlined which is applicable to all contempt cases, interveners have the burden here of showing not only discrimination, but discrimination "on the ground of their race or color", such being the terms of the decree.

After a careful consideration of all of the interveners' contentions and all evidence adduced, this court is convinced that no discrimination, and hence no contempt, has been shown. I find that the Brotherhood, in good faith both nationally and locally, adopted a policy of distributing the work among firemen represented by it as bargaining agent. This policy has been, and is being, applied not only on the Central but on other railroads. It is not a surprising policy in view of the reduced need for firemen. A diesel engine pulls longer trains than the old steam locomotive engine and one engineer and one fireman, or helper as he is now called, on diesel locomotives operate multiple diesel units. On the Central, this policy has been, and is being, applied not only to interveners but to any and all firemen to whom mileage conditions render it applicable, and it is applied not only on the Columbus division, but on all divisions and districts where circumstances permit. The Central has three divisions, Savannah, Macon and Columbus, the Savannah division having only one district, namely, the Savannah district; the Macon Division having two districts, namely, the Atlanta and the Southwestern and the Columbus division having two districts, namely, the Columbus district and the Cedartown district. No racial discrimination was involved in adding this swing man. This additional job was not created for a white man. Interveners allege in Exhibit B, the affidavit of Al Marshall attached to their petition, that the swing job was held by R. B. Gable, a white man, who, although junior in seniority to Negro firemen from whom he takes mileage, is permitted to make mileage and pay equal to and greater than the mileage and pay of the senior Negro firemen from whom he takes his mileage. I find, however, that this job was, in accordance with the applicable agreement between the Central and the Brotherhood, regularly bulletined for the first five days in March, 1957 and was available to the highest seniority bidder who turned out to be Will Covington, one of the five interveners. He bid this job in on March 6, 1957 and held the run until March 31,

1957. The white man, Gable, may have held the run from the extra board during the first five days of March while it was being bulletined. Later, he was swing man from April 18, to May 31, August 29 to September 8, and December 1 to December 17. It is true, therefore, that this swing job, like all other firing jobs on Central, was open to the highest bidder regardless of race or color and there is considerable turnover in some of these jobs according to the bidding.

The use of a swing man on the Central is not new. As above shown, swing men are provided for by Section 2(h) of Article 26, of the Schedule of Wages, Rules and Regulations. Mr. W. M. Ector, the Central's superintendent on the Columbus division, found a swing man in passenger train service when he came to Columbus in 1953. Three passenger trains were being operated to Birmingham and the five firemen assigned to these trains were four colored and one white. Four passenger trains were being operated to Atlanta and the three firemen assigned to them were two colored and one white. In March, 1953, a white man was put on these runs as a swing man, swinging on both the Birmingham run and the Atlanta run and taking mileage from both Negro and white firemen and making a little more than the regular firemen. There is a swing man on the Savannah division now having been there approximately five years, although no swing men have been added in that division in the last three years. William E. Mitchell, Vice-President of the Brotherhood, testified that swing men are used throughout the country as a general practice and related an instance in 1953 on the Atlantic Coast Line in Georgia where white firemen, members of the Brotherhood, were challenging its authority to add a man to an assigned run thereby bringing the mileage of these men below the minimum prescribed by the rules. The man was added, the mileage reduced and this action was affirmed through all the Appellate procedure of the Brotherhood.

The fact that the minimum monthly mileage was reduced from 3,200 to 3,000 has made it possible to keep men in pools who would otherwise have been removed, thus saving jobs, and has made it possible to add men to pools and on extra boards, thus creating more jobs. Five specific instances were disclosed. (1) During the first half of May, 1957, in the Southwestern district of the Macon division there were in a freight service pool three white and two colored firemen making a total 15 day mileage of 9,366 or 1,873 miles per man. The reduced mileage agreement permitted the addition of a sixth man for the second half of the month when the total mileage was 10,286. The effect of adding the sixth man was to take away from each of the three white and two colored firemen 343 miles for the month. (2) For the first half of September, 1957 in the Southwestern district of the Macon division there were in pool freight service five white and one Negro firemen each making for said half month a mileage of 1500. Had it not been for the reduced mileage agreement a man would have been taken from the pool. During the second half of the month the six men made 1,488 miles each. If, during the second half there had been only five men in the pool the average for said half would have been 1,786 miles. Thus, but for the reduced mileage agreement, five of these men would have earned 298 miles more than they did. (3) On an extra board in the Atlanta district of the Macon division for the second half of April, 1957 because of the new rule and the addition of a sixth man five white firemen lost 373 miles per man. (4) On an extra board in the Columbus division Cedartown district because of the new rule three white firemen lost 773 miles each for the second half of August, 1957. (5) On March 16, 1957, a man was added to the extra board on the Savannah division, this being made possible by the reduced mileage agreement.

Coming now to the four instances claimed as aggravation of the alleged

discrimination, while it might suffice to say that there can be no aggravation of discrimination in the absence of discrimination, an analysis of these claims is to be preferred.

Interveners' claim that they were frozen in these reduced mileage jobs and thereby denied their contractual right to shift to others would be serious, if substantiated. Certainly, if these men were, because of their race, denied the right to assert their firing seniority with respect to any job open to white men because of firing seniority, they would be entitled to quick and certain relief. Notwithstanding the fact that this claim was not mentioned by interveners in their pleadings, the court, nevertheless, ruled at the trial that they were entitled to show the overall picture of what was being done, the consequences of it, the background, the setting and how it all operated. This particular claim is based upon interveners' interpretation of Section 6(d) of the Schedule of Wages, Rules and Regulations and particularly upon that portion herein underscored, which section reads as follows:

"(d) Changes of time tables, of schedules, and of rates of pay do not constitute changes in working conditions that will warrant runs to be bulletined. <u>RUNS WILL BE BULLETINED WHEN MILES ARE ADDED TO OR TAKEN FROM THE RUN</u>, or where the terminal or lay-over of such runs are changed. This is to apply to all men in engine service, except on local freight schedules which are changed three hours or more." (Emphasis supplied.)

Admittedly, interveners' runs as distinguished from the new swing run were not bulletined and interveners point out, therefore, that they were not permitted to roll a junior fireman off his job, but would have to remain on their old jobs until some other job was advertised at which time concededly they could bid. At most, therefore, this is a claim of a temporary freeze. Apparently, this claim is not taken or asserted too seriously by interveners. Not only was it not mentioned in their pleadings, but their counsel, in outlining their contentions to the court, said with reference to this claim: "And, as I said before, this is not material to the case but aggravates what happened to these men, in that it reduced their mileage and actually froze them into that reduced mileage. But it is not that against which we seek relief, but against the reduction in mileage." While intervener Marshall testified that if his job had been bulletined there were two other jobs he could have got, I find that one of these jobs was bulletined subsequent to March, 1957 and that he did not take it then because he preferred to stay where he was. When he was asked whether, if the other one had been bulletined he would have changed his mind about it as he did about the one which was bulletined, he stated: "Maybe I could have; I don't know." This particular contention presents, at most, a question of interpretation of Section 6(d). Interveners claim that under this section their jobs should have been bulletined. The Brotherhood contends, on the other hand, that when a swing man is added only the swing man's job should be bulletined. The Brotherhood's position is that the language of the rule "runs will be bulletined when miles are added to or taken from the run" relates to the run itself and not to the man, and that if the run is lessened, for instance where the terminal is changed, the run will be bulletined, whereas, if the runs remain the same they are not to be bulletined even though a swing man is added thereby causing the firemen to earn less from their runs. The General Chairman of the General Committee of the Brotherhood, who has held that position since June 1, 1953 and who has been employed by the Central for approximately 15 years, testified that such has been the interpretation of this section ever since he has known about it. There is no contention that this section has ever been applied in this type situation other than in the same manner it was applied here. Therefore, no discriminatory application of this section has been shown.

The claim that no comparable reduction in the pay of white firemen was made has been fully covered.

Interveners' claims by way of aggravation that their pay loss necessarily goes to white firemen and that a Negro fireman cannot supplement his earnings while a white fireman holding seniority in other lines of work may do so both stem from the railroad and Brotherhood discrimination against Negro firemen by denying to them the right to be promoted to engineers' jobs. Interveners' counsel, himself, answered these contentions in his opening statement when, in reply to the court's inquiry: "That is because one is promotable and one is not?", said:

"That aggravation results from that fact, that's right. But we, of course, do not seek any relief with respect to that. It is one that has been built in by virtue of the discrimination practiced for 50 years and there is no longer any solution to that, so we do not seek any redress against it. We merely point it out to illustrate that this new reduction in the mileage has caused a more aggravated situation to arise."

■ Of course, it is only partially true that interveners' pay loss goes to white firemen. Immediately, their pay loss, as has been demonstrated, goes to the swing man, who most generally is a Negro because of the Negroes' high seniority as firemen. It may go, more or less temporarily, to a demoted engineer who claims a firing assignment until he can return to duty as an engineer. To the extent that the addition of the swing man creates one more firing job in the overall firing picture for the benefit of a junior fireman way down on the list, this pay loss does benefit a white junior fireman. This is necessarily so because under the old 50% rule, stricken down by the injunction in this case, over a long period only white firemen were added as employees and so many were added that during the last fifteen years no new firemen, white or colored, have been employed in the Columbus division. The identity of firemen at the bottom of the seniority list, therefore, results from discrimination which antedated the injunction and which the injunction did not undertake to correct except for the future. With respect to these contentions, therefore, the respondents cannot be adjudged in contempt for failing to do more than the injunction required.

In the case of Oliphant v. Brotherhood of Locomotive Firemen and Enginemen, D.C.N.D.Ohio 1957, 156 F.Supp. 89, 90, where complainants sought to compel the Brotherhood to admit Negro firemen to membership, certain acts of discrimination were alleged including the addition of this swing man involved in this case, and Al Marshall, one of the Interveners here, testified there covering this common feature or aspect of the two cases. In the opinion in that case, Chief Judge Jones wrote:

"It is the plaintiffs' position that the Brotherhood has never represented the Negro workers on equal terms with the white workers, that the United States Supreme Court in Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, recognized at least one instance of this unequal treatment and ordered the Brotherhood to cease this discrimination, and that the Brotherhood continues to exercise discrimination in its representation, particularly in (1) reducing the minimum mileage requirements for firemen, which has the effect of reducing the monthly income of the Negroes; (2) applying the 'gouge' rule in such a way as to reduce earnings of the Negroes; (3) applying the mileage rules to firemen and not to demoted engineers; and (4) bargaining for a compulsory retirement at age 70. For reasons which shall appear later, these alleged acts of discrimination will not be discussed in detail, but it should be noted that as to (3) above, proof was mainly in the form of opinion and was denied by Brotherhood officials, while (1), (2) and (4) are legitimate practices used by most unions for reasons other than discrimination, and since they apply to all who come within the terms of the rule involved, whether the individuals are white or colored, this court cannot state defi-

nitely that this Brotherhood adopted these practices for the purpose of discrimination against the Negroes."

Collective bargaining contracts and arrangements worked out in good faith between the statutory representative of a craft and the employer are not vitiated merely because they "may have unfavorable effects on some of the members of the craft represented." Steele v. Louisville & Nashville R. Co., 1944, 323 U.S. 192, 203, 65 S.Ct. 226, 232, 89 L.Ed. 173, 183. See also Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048; Aeronautical Industrial Dist. Lodge 727 v. Campbell, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513.

Let counsel for respondents prepare a judgment in accordance herewith and submit the same to counsel for interveners who shall have five days for suggestions as to form.