**LOUISIANA EDUCATION
ASSOCIATION et al.**

v.

**RICHLAND PARISH SCHOOL
BOARD et al.**

Civ. A. No. 76–0548.

United States District Court,
W. D. Louisiana,
Monroe Division.

Oct. 26, 1976.

William J. Jefferson, Jefferson & Bryan, New Orleans, La., for plaintiffs.

Stephen J. Katz, Paul Henry Kidd, Kidd, Katz & Strickler, P.C., Monroe, La., for defendants.

## OPINION

STAGG, District Judge.

The Louisiana Education Association (LEA), the Richland Parish Education (RPEA) and Ms. Lottie S. Dickson brought this action to enforce an order of this Court of June 12, 1975, in Civil Action 15,796, *Hope Smith, et al v. Richland Parish School Board, et al*, and in Civil Action 12,169, *United States v. Richland Parish School Board, et al.* Plaintiffs named the School Board, the Superintendent and several Board members in Richland Parish as defendants. A copy of the order, which resulted from a consent decree, is attached as an Appendix to this opinion. Plaintiffs styled their pleading a motion for a "rule to show cause" why defendants should not be held in contempt of court. The pleading alleged a failure to comply with the order's procedure, such that plaintiff Lottie S. Dickson did not receive a particular job. Plaintiffs requested relief to force defendants to comply with the order and to compensate Ms. Dickson for her alleged loss.

Importantly, plaintiffs sought remedial relief in the form of a contempt order rather than substantial relief in an independent action. For that reason, their claim rests solely on the order and not on any other theory or cause of action independent from it.

The gist of plaintiffs' claim is that defendants hired Ms. Christine Ford, a white female, for the position of lunchroom supervisor when the Court's order required the board to hire or promote a black person for the position. More specifically, Ms. Dickson alleged that she should have been the black person to be hired. The proceeding came on for hearing in Monroe, Louisiana, on August 9, 1976. Plaintiffs introduced oral and documentary evidence, then rested.

Defendants moved for a directed verdict or to dismiss. The Court discussed with counsel the procedure it should follow from that point forward. Petitioners claimed that respondents bore the burden of proof that they did not violate the order, while the Court and respondents suggested that petitioners bore the burden of proving noncompliance. Petitioners also claimed that the proceeding was not independent; thus, they said, a motion for directed verdict was improper. How the motion was denominated is unimportant. Because a contempt proceeding is a *sui generis* phenomenon, no specific forms are supplied by the Federal Rules of Civil Procedure. The gravamen of the motion was that defendants need not produce any evidence due to plaintiffs' failure to carry its burden of showing noncompliance. Thus, it is analogous to and may be considered as a motion for involuntary dismissal pursuant to F.R.C.P. 41(b). The Court took the motion under advisement.

## THE NATURE OF THE CONTEMPT PROCEEDING

The power of a court to punish persons for contempt is an inherent power claiming deep historical roots. *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 22 L.Ed. 205 (1874); *United States v. Fidanian*, 465 F.2d 755 (5th Cir.), cert. denied, 409 U.S. 1044, 93 S.Ct. 540, 34 L.Ed.2d 494 (1972); *United States v. Dickinson*, 465 F.2d 496, 510 (5th Cir. 1972), on remand, 349 F.Supp. 227 (M.D.La.1972), aff'd, 476 F.2d 373 (5th Cir.), cert. denied, 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223 (1973); 11 Wright & Miller, Federal Practice & Procedure § 2960 at 581 (1973) [hereinafter cited as 11 Wright & Miller]. In an early case, the United States Supreme Court recognized the necessity for the power and its existence:

"The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts, and consequently, to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power." *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1874).

Of course, the power to punish for contempt includes the power of a court to redress violations of its own orders. *United States v. Fidanian*, 465 F.2d 755, 757 (5th Cir.), cert. denied, 409 U.S. 1044, 93 S.Ct. 540, 34 L.Ed.2d 494 (1972). The court may exercise its power with discretion, and some courts have held that the power should be used sparingly. *United States v. Reide*, 494 F.2d 644 (2d Cir. 1974); *United States v. Dickinson*, 465 F.2d 496, 513 (5th Cir. 1972), on remand, 349 F.Supp. 227 (M.D.La.1972), aff'd, 476 F.2d 373 (5th Cir.), cert. denied, 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223 (1973); *United States v. Panico*, 308 F.2d 125 (2d Cir. 1962), vacated on other grounds, 375 U.S. 29, 84 S.Ct. 19, 11 L.Ed.2d 1 (1963). However, a court's discretion is not unfettered. A court cannot refuse to preserve rights under its own order absent extraordinary circumstances. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 365 (1949).

Fundamentally, two kinds of contempt exist. Civil contempt vindicates the rights of aggrieved persons under valid court orders, while criminal contempt vindicates the court's power and authority without reference to any party. *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976); *Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 910 (3d Cir.), cert. denied, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975); *International Business Machines Corp. v. United States*, 493 F.2d 112, 115 (2d Cir. 1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974). The aggrieved party institutes the proceeding and controls the litigation in civil contempts while generally the court initiates a criminal contempt proceeding. 11 Wright & Miller § 2960 at 587–88; cf. *Flight Engineers International Association v. Eastern Air Lines, Inc.*, 301 F.2d 756 (5th

Cir. 1962); *FTC v. A. McLean & Son*, 94 F.2d 802 (7th Cir. 1938). The aggrieved party benefits from the court's finding of civil contempt. He may receive coercive or compensatory relief. Coercive relief attempts to persuade the other party to comply with the court's order, while compensatory relief reimburses the aggrieved party for his losses due to the adversary's noncompliance. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 365 (1949); *Norman Bridge Drug Co. v. Banner, supra*, at 827. The court and the public interest benefit from a determination of criminal contempt.

■ Plaintiffs seek to enforce a court order and obtain relief for Ms. Dickson; they request both coercive and compensatory relief. Obviously they do not aim toward the vindication of the Court's power or authority. Thus, the pleading in this cause speaks in terms of civil, not criminal contempt.

■ The petitioner in a proceeding in civil contempt bears the burden of proving that the respondent violated some court order, especially when the respondent denies the material allegations in the pleading. *Schauffler v. Local 1291, International Longshoremen's Association*, 292 F.2d 182, 189 (3d Cir. 1961); *Cohn v. Kramer*, 136 F.2d 293 (6th Cir. 1943); *NLRB v. Reed & Prince Manufacturing Co.*, 130 F.2d 765 (1st Cir. 1942); *NLRB v. Whittier Mills Co.*, 123 F.2d 725 (5th Cir. 1942); *Washington v. Central of Georgia Railway Co.*, 174 F.Supp. 33 (M.D.Ga.1958), *aff'd*, 268 F.2d 445 (5th Cir. 1959), *cert. denied*, 361 U.S. 943, 80 S.Ct. 407, 4 L.Ed.2d 363 (1960). The "order to show cause" is a widely used method of instituting a civil contempt proceeding, but it merely is a method of serving notice on the party allegedly in noncompliance. It does not shift the burden of proof from the petitioner to the respondent. *In re Van Meter*, 413 F.2d 536, 538 (8th Cir. 1969).[1] The burden that remains with petitioner is

to show the violation by clear and convincing evidence. A bare preponderance of the evidence will not suffice. *Stringfellow v. Haines*, 309 F.2d 910, 912 (2d Cir. 1962); *Schauffler v. Local 1291, supra* ; *Telling v. Bellows-Claude Neon Co.*, 77 F.2d 584, 585 (6th Cir.), *cert. denied*, 296 U.S. 594, 56 S.Ct. 108, 80 L.Ed. 420 (1935); *Washington v. Central of Georgia Railway Co., supra* ; 11 Wright & Miller § 290 at 591. The petitioner need not prove a willful violation of the order. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 365 (1949); *NLRB v. Local 282, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 428 F.2d 994, 1001 (2d Cir. 1970); *Telling v. Bellows-Claude Neon Co., supra*, at 586; 11 Wright & Miller § 2960 at 592.

■ Most orders that are the object of civil contempt proceedings arise out of the equitable jurisdiction of the court. For example, frequently a petitioner seeks, by civil contempt proceeding, to coerce his adversary into compliance with an injunction, mandatory or prohibitive. As a matter of legal theory, the burden of proving noncompliance by clear and convincing evidence stems from a presumption of sorts that a party will comply with court decrees. In civil contempt, the presumption in turn derives from the equitable maxim, *Equity regards as done that which ought to be done*.[2] As a practical matter, the heavy burden protects parties who are in compliance. Were it not for the heavy burden on the petitioner, there would be no deterrent to frivolous pleadings in civil contempt; an individual would face virtually no risk. The respondent then would face burdensome and repetitious allegations from which he would have to extricate himself time and time again. The burden existing, courts impose a balance of power between petitioner and respondent. Petitioner must feel that he has a strong case before he complains, and respondent faces grave pen-

---

1. *Van Meter* dealt with criminal contempt. Nonetheless, the principle that the semantics of the order do not shift the burden of proof applies equally to civil contempt.

2. In criminal contempt, it derives from the presumption of innocence and manifests itself in the burden of proving guilt beyond a reasonable doubt.

alties, including costs and attorneys' fees, if petitioner succeeds. Petitioner is deterred from filing frivolous actions and respondent is encouraged to comply with the court order.

▮ Based on policy and principle, then, in a civil contempt proceeding the petitioner first must show, by clear and convincing evidence, a violation of a valid court order.[3] Then the respondent must show any mitigating circumstances that might cause the court, in its discretion, to withhold the exercise of its contempt power. The respondent's showing following petitioner's evidence gives rise to the "order to show cause" terminology.

### THE ORDER OF JUNE 12, 1975

The order of June 12, 1975, establishes a racial mix goal and a procedure to enhance achievement of the goal without complete disruption of the educational system in Richland Parish. The order is confusing and apparently contradictory in some of its parts, but it is not impossible to interpret.[4]

The order applies in the selection of principals, assistant principals, counselors, teachers, coaches, supervisors and other professional personnel. It will remain in effect until a 62–38% white-black ratio exists in each of five categories of professional personnel, one of which includes supervisors, the relevant category to this contempt proceeding.[5] The School Board must follow the specified procedure during the entire "transition period."

The order establishes a priority system for the Board to follow in its hiring and promotion decisions. The Board first must look to personnel within the school system; if it cannot fill the position according to the criteria enumerated in the remainder of the order, it then may turn to personnel outside of the school system. Within each of the

subsets, persons within and persons without the school system, the order states a preference for "qualified persons" of the "race specified" to achieve the prescribed white-black ratio. If the Board cannot find a qualified person of the specified race, it must recruit a qualified person of the "designated race" to fill the opening.

With respect to Category III, supervisors, the order states:

> "Employ and/or promote two black supervisors for every white supervisor employed and/or promoted until a total of 38% black supervisors are [sic] achieved. Employ and/or promote two black supervisors first."

The section does not mention qualifications or procedure. Therefore, it presents an apparent contradiction with the procedural part of the order, which enumerates a point system for choosing from among the applicants. A bare reading of that section indicates that the Board could appoint the top person according to the point system, whether the person was black or white and whether the allocation system mandated the hiring or promotion of a black or a white. This litigation provides an opportunity for the Court to untangle the web spun by the consent decree.

For each supervisory or other professional opening, the Board shall take applications. It will rate each applicant according to the objective criteria of Phase I, the Preliminary Evaluation.

Following completion of Phase I, the administrative review committee, appointed by the superintendent according to the guidelines of the order, shall interview all prospective applicants by questioning them on the various topics specified in Phase II. The committee then will assign a point value to the interview by majority vote, com-

---

3. Because the civil contempt relief is remedial, a party may be the beneficiary of relief only if he is entitled to it. If the order is invalid, *ergo* the party is not entitled to the relief, a remedy in civil contempt does not lie. *E. g., Universal Athletic Sales Co. v. Salkeled*, 511 F.2d 904, 909–10 (3d Cir. 1975), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975).

4. The text of the order is included as the Appendix to this opinion.

5. As the facts, *infra*, will show, Ms. Dickson applied for and was rejected for the position of lunchroom supervisor.

pleting Phase II. Although the order itself is silent about minimum criteria, it is a power inherent in the creation of the administrative review committee to reject, by majority vote, any candidate who does not possess the minimum objective qualifications according to Phase I criteria to perform the job for which the candidate applied.

To begin Phase III, the review committee shall forward a list of the three applicants with the highest point totals, adding Phase I and Phase II, to the superintendent. The superintendent then shall recommend one of the three to the Board for appointment to the position.

At Phase III, the coordination of various parts of the order is necessary. The two-for-one hiring and promotion system is unconditional. The system determines the "designated race" or "specified race" for a particular position. The superintendent *must* appoint a person of that race from the list of three applicants. If none of the three is of the specified race, the entire process must be re-instituted and the Board must recruit applicants of the designated, or specified, race for the position.

In summary, the process of Phase I and Phase II determines who is a "qualified applicant". If the administrative review committee reports a person as one of the top three applicants, then that person is "qualified" under the order. If more than one of the qualified applicants is of the specified race, whether it be black or white, the supervisor and the Board may exercise their judgment to fill the position with any applicant of the specified race. If only one of the qualified applicants is of the specified race, that person must be appointed. If none of the applicants is of the specified race, the Board must take applications again and recruit persons of the specified race to apply.

According to the interpreted order, what must plaintiffs show to prove that defendants violated the order in the case of hiring Christine W. Ford over Lottie S. Dickson for lunchroom supervisor? First, they must show that Ms. Dickson was qualified for the position; that is, she must have met the minimum criteria of Phase I and have been reported to the superintendent as one of the top three applicants, making her a "qualified applicant". Second, they must show that the designated or specified race was black; that is, they must show that, in the then current "round" of three openings, two blacks had not been hired as supervisors at the time Ms. Ford was hired. The plaintiffs besides Ms. Dickson may prevail if they prove the second point even though they fail on the first; Ms. Dickson is not entitled to relief if she was not a "qualified applicant". Alternatively, any of the plaintiffs may prevail by showing that the Board ignored the procedure set forth in the order. The Board is not in contempt if it followed the outlined procedure and the designated race was white or if plaintiffs failed in their necessary proof.

## FINDINGS OF FACT

1. At the opening of their case, plaintiffs introduced the order of June 12, 1975, as Exhibit P–1. It is reproduced as the Appendix to this opinion.

2. Lottie S. Dickson applied for the position of lunchroom supervisor in Richland Parish upon learning of an opening in that position. She was interviewed by the administrative review committee and spoke with the superintendent about the position. On January 5, 1976, she received a letter, Exhibit P–2, informing her that someone else had been awarded the position.

3. Ms. Dickson met the criteria issued by the State Department of Public Education in Bulletin No. 1196 (1971) for the position she sought. Exhibit P–3. Those criteria are:

"[a] A baccalaureate degree from a regionally-accredited higher education institution

[b] A minimum of 3 years of successful experience in education, school food service management or other quantity food service management. At least 2 years of this experience must have been served within a 5-year period immediately pre-

ceding employment as Director or Supervisor

[c] A minimum of 3 semester hours of supervised experience in school food service management or other quantity food service management under the supervision of a qualified person or 3 years' experience in school food service management or other quantity food service management

[d] A minimum of 15 semester hours as listed for the subject areas below:

[i] Human nutrition—5 semester hours

[ii] Ten semester hours must be presented in course credit in at least four of the subject matter areas below:

[1] Quantity food purchasing (Institution food purchasing)

[2] Quantity cookery

[3] Quantity food service organization and management (Institution organization and management)

[4] Quantity food service equipment (Institution food service equipment)

[5] Accounting (Preferably food cost accounting)

(A combination of two or more of these five subject matter areas into several courses is acceptable)" Exhibit P–3, p. 32.

4. Ms. Dickson claimed that the state criteria were the only minimum criteria for the position, but she did not establish that she was in a position to know whether Richland Parish could or did adopt formal or informal criteria besides the state guidelines. The Court has no basis to conclude that she met any minimum qualifications applicable in Richland Parish with respect to the position of lunchroom supervisor.

5. Ms. Dickson's total score in Phase I and Phase II was 28 points. In Phase I, she received one point for her letter of application, one point for her professional organizations, and one point for her teaching experience. In Phase II, she received five points, the maximum, in each of the following categories: scheduling, personnel, student affairs, finance, and school plant facilities. The 25 points in Phase II constituted

the maximum allowable under the June 12 order's procedure.

6. Plaintiffs presented no evidence concerning any other applicants for the position. The Phase I and Phase II scores of Christine Ford are not in evidence. The evidence does not reflect whether Ms. Dickson was among the three "qualified applicants" for the position as reported to the superintendent.

7. Plaintiffs produced no evidence to show whether two blacks had been hired as supervisors since the hiring of the last white supervisor. The Court has no basis to determine what the designated or specified race, as described in the order, should have been with respect to the job for which Ms. Dickson applied.

## CONCLUSIONS OF LAW

1. Petitioners did not prove by clear and convincing evidence that the Richland Parish School Board did not follow the procedure required by the order of June 12, 1975.

2. Petitioners did not prove by clear and convincing evidence that the designated or specified race for the job for which Ms. Dickson applied was black or Negro.

3. Petitioners did not prove by clear and convincing evidence that Lottie S. Dickson was qualified for the position of lunchroom supervisor in Richland Parish.

4. Petitioners did not prove by clear and convincing evidence that Lottie S. Dickson was a "qualified applicant", as defined by the order of June 12, 1975, for the position of lunchroom supervisor in Richland Parish.

5. Petitioners did not sustain their burden of proving that respondents violated the June 12, 1975, order. Respondents, therefore, may not at this stage be held in civil contempt of this Court for violation of the June 12, 1975, order.

6. The Court already has ruled that it will treat respondents' motion as a motion for involuntary dismissal by virtue of F.R. C.P. 41(b). The rule provides, in pertinent part:

"After the plaintiff, in an action tried by the court without a jury, has complet-

ed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event [his] motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a)."

7. Clearly, whether the Court rules on the evidence at the close of petitioner's case is a matter within its discretion. In their memorandum in opposition to respondents' motion, petitioners assert that an exercise of that discretion in favor of the rendition of judgment is improper unless respondents can show some prejudice that would result from the Court's allowing petitioners to adduce further evidence. They cite *Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947), in support of their assertion. However, *Cone* dealt with the right of a plaintiff *voluntarily* to dismiss his suit if he learns of defects in his proof that he might cure by further preparation and presentation of evidence. The Court did not deny that option to petitioners in this cause. Under Rule 41(a), they retained the right voluntarily to dismiss; they did not exercise that right.

8. What petitioners essentially request the Court to do is to evaluate their proof, determine how they might proceed more successfully, and then suggest to them that they do so while allowing them a "second bite at the apple". To undertake such drastic measures would require the Court to don the cloak of petitioners' counsel; that it will not do. The Court informed petitioners' counsel of its opinion that the evidence adduced when petitioners rested was insufficient. Petitioners could have dismissed their action voluntarily at that point; they did not. Instead, they chose to stand on their position with respect to their evidentiary showing.

9. The Court afforded petitioners every opportunity to go forth with further evidence to prove their case. They failed in their proof. The Court chooses to exercise its discretion by rendering judgment in favor of respondents, as petitioners have shown no right to relief.

10. There should be judgment in favor of respondents and against petitioners. Petitioners should bear the costs of the action.

### ORDER

For the reasons given, it is ordered that there be judgment in favor of all defendants and against all plaintiffs in the cause of *Louisiana Education Association, et al v. Richland Parish School Board, et al,* Civil Action No. 76-0548, dismissing plaintiffs' claim with prejudice. Defendants shall recover of plaintiffs their costs of the action.

Appendix to follow.

## APPENDIX

HOPE SMITH, et al.,

 Plaintiffs

v.

RICHLAND PARISH SCHOOL BOARD, et al.,

 Defendants

consolidated with

UNITED STATES OF AMERICA,

 Plaintiff

v.

RICHLAND PARISH SCHOOL BOARD, et al.,

 Defendants.

Civ. A. Nos. 15796 and 12169.

United States District Court,
W. D. Louisiana,
Monroe Division.

June 12, 1975.

### ORDER

STAGG, District Judge.

Considering the records of these proceedings, the testimony and the evidence adduced at the trial of these proceedings on April 23, 1975, and the law applicable thereto, it is therefore:

ORDERED, ADJUDGED AND DECREED that defendants immediately implement the following objective criteria for the selection of principals, assistant principals, counselors, teachers, coaches, supervisors, and other professional personnel:

Personnel within the school system shall be preferred over all prospective employees from outside the Richland Parish School System. In the event that there is not a qualified person within the school system the defendants shall go outside the Richland Parish School System to employ same. In the event that there is not a qualified person of the race specified during the transition period to achieve the 62% – 38% white – black ratio established within this order, and there is a qualified person of the other race, defendants shall recruit a qualified person of the designated race to fill the vacant position. An individual to be promoted to any one of the aforestated positions shall be selected and evaluated by the hereinbelow standard of professional preparation and experience:

PHASE I

PRELIMINARY EVALUATION

| CRITERIA | POINTS |
|---|---|
| A. Letter of Application | 1 |
| B. Formal Education | |
| 1. Doctor's Degree (appropriate) | 5 |
| 2. Specialists Degree (appropriate) | 4 |
| 3. Master's Degree plus 30 hours (appropriate) | 3 |
| 4. Master's Degree (appropriate) | 2 |
| C. Professional Organizations | |
| 1. Active in one or more education organizations | 1 |
| 2. Present or past officer in an education organization | 1 |
| 3. Active participation in a learned society | 1 |
| D. Teaching Experience | |
| 1. Five years experience in teaching | 3 |
| 2. Four years teaching experience | 2 |
| 3. Three years teaching experience | 1 |
| E. Administrative or Other Experience | |
| 1. One year or more as an assistant principal | 2 |
| 2. One year or more as a principal | 3 |
| 3. One year or more as a guidance counselor | 2 |
| 4. One year or more as a parish supervisor | 3 |
| F. TOTAL CUMULATIVE POINTS | _____ |

## PHASE II

### ADMINISTRATIVE REVIEW

A committee consisting of four individuals and three principals from the administrative staff shall be appointed by the superintendent for the purpose of conducting this procedure of an administrative review. There shall be at no time greater than four (4) members of any one race appointed to said committee.

The committee thus formed shall interview all prospective applicants for any of the aforesaid positions and shall assign, by majority vote, up to five (5) points for each of five (5) questions the committee asks the applicants concerning any of the following six (6) areas:

a) scheduling, b) personnel, c) student affairs, d) curriculum, e) finance or f) school plant facilities.

## PHASE III

### SELECTION

A list of the three (3) applicants, in order, who scored the highest point totals with all points from Phases I and II added together, shall be forwarded to the superintendent who in turn shall recommend one of the top three to the School Board for appointment to the position for which the application is being considered;

FURTHER ORDERED, ADJUDGED AND DECREED that the defendants immediately institute the hereinbelow promotional and hiring plan to achieve a 62% white – 38% black staff.

CATEGORY I : TEACHERS

Employ one black for every white teacher hired until the total black school room teachers have reached 38% throughout the school system. Maintain at least a 38% ratio of black teachers within the school system after that percentage has been achieved.

CATEGORY II : PRINCIPALS–ASSISTANT
PRINCIPALS–COUNSELORS

Employ two blacks for every white promoted until the total blacks in the combined category reaches 38%. While the category combines three positions for consideration of the 38%, defendants shall not designedly and/or discriminatorily place more than 38% black or 62% white in any one of the three positions. Once the 38% black ratio has been achieved, maintain at least a total of 38% blacks in this category throughout the school system.

CATEGORY III : SUPERVISORS

Employ and/or promote two black supervisors for every white supervisor employed and/or promoted until a total of 38% black supervisors are achieved. Employ and/or promote two black supervisors first. Immediately institute a redefinition and restructuring of job classifications of supervisory personnel to reflect commensurate responsibility to salary paid. Make supervisory jobs held by blacks meaningful in a supervisory and educational sense.

CATEGORY IV : COACHES

Maintain at least a 38% black total of coaches in the school system. No distinction is made between head and assistant coaches, but defendants shall not designedly and/or discriminatorily place more than 38% blacks in either category.

CATEGORY V : ALL OTHER SCHOOL BOARD
PERSONNEL, INCLUDING BUT NOT
LIMITED TO BUS OPERATORS,
LUNCHROOM PERSONNEL,
JANITORIAL PERSONNEL,
MAINTENANCE PERSONNEL,
CLERICAL PERSONNEL AND
TEACHER AIDS

Employ two blacks for every white in all other jobs in the school system, excepting those categories listed above until there is a composite total of 38% blacks throughout the school

system. No distinction is to be made between state and federally funded programs. Defendants shall not designedly and/or discriminatorily place blacks in jobs requiring less skills or paying less money.

FURTHER ORDERED, ADJUDGED AND DECREED that defendants immediately adopt an affirmative recruitment program designed to recruit qualified black personnel in all of the above listed categories from within and without the greater Monroe trade area and post job vacancies in all categories on a bulletin board at its central office and at each of the schools throughout the parish at least seven (7) days before instituting the preliminary evaluation described in Phase I above;

FURTHER ORDERED, ADJUDGED AND DECREED that defendants not discriminate on the basis of race, sex, religion, national origin or age in the dismissal or demotion of any employee;

FURTHER ORDERED, ADJUDGED AND DECREED that in the event any individual professional employee who is not tenured under the laws of the State of Louisiana is advised by the superintendent and/or the School Board that he will not be employed the following school year in his current position or any other position, the affected individual may request, at his option, an administrative hearing before a review board, said board consisting of two (2) supervisors, one (1) classroom teacher, and one (1) school board member, and one (1) additional administrative employee, all of whom are to be appointed by the superintendent. The said review board shall at no time be composed of more than three (3) members of any one (1) race. The said review board shall conduct a hearing upon request of the individual involved and shall receive all evidence and testimony necessary to make a recommendation, by majority vote, to the superintendent, concerning whether the individual should be in fact demoted or discharged;

FURTHER ORDERED, ADJUDGED AND DECREED that the system of public schools in Richland Parish, Louisiana, as they presently exist, are hereby deemed and declared to be a unitary system for all legal purposes;

FURTHER ORDERED, ADJUDGED AND DECREED that defendants pay plaintiffs' reasonable attorney fees in the amount of TWO THOUSAND ONE HUNDRED FIFTY AND NO/100 ($2,150.00) DOLLARS.