FINDINGS OF FACT AND CONCLUSIONS OF LAW
HUGH GIBSON, District Judge.
I. INTRODUCTION
This contempt proceeding arises out of an employment discrimination case brought in 1971 by plaintiffs George B. Sanders, Wesley Sam, Jr., Samuel Crittendon and others, individually and on behalf of a class of persons similarly situated, pursuant to 42 U.S.C. §§ 2000e, et seq., and 42 U.S.C. § 1981, against Monsanto Company (Monsanto), Texas City, Texas Metal Trades Council (Council), Local 347 and Local 968.[1] On May 12, 1975, the Court entered a consent decree retroactively effective May 10, 1974, and retained jurisdiction of the action for three years to ensure compliance with the terms of the decree.[2]
Prior to the expiration of the three-year period, on January 1, 1977, plaintiffs George B. Sanders, Wesley Sam, Jr., and Samuel Crittendon filed a “Motion to Hold Defendant in Contempt of Court or in the Alternative Motion for Further Relief.” Judge Ross N. Sterling, then presiding, denied plaintiffs’ motion without affording plaintiffs an evidentiary hearing, and plaintiffs appealed. The United States Court of Appeals for the Fifth Circuit reversed and remanded, holding that the trial court erred in failing to hold an oral hearing and failing to make findings of fact and conclusions of law. Sanders, et aI. v. Monsanto, et a/., 574 F.2d 198 (5th Cir. 1978).
This Court, in accordance with the mandate of the Court of Appeals, held an evidentiary hearing on November 10 and 12, 1980. The parties, except for George B. Sanders who was not present,[3] appeared by *701 and through their counsel. A Joint Pretrial Order was entered at the commencement of trial in accordance with the practice of the Court and Rule 16, Fed.R.Civ.P., and trial was to the Court without a jury.
The primary issue before the Court is whether Monsanto and Council violated the terms of the consent decree by requiring plaintiffs Sam and Crittendon to take and pass certain tests administered in conjunction with the painter and pipefitter apprenticeship programs at Monsanto. Plaintiffs Sam and Crittendon contend that defendants have violated Sections II and III(c) of the consent decree by requiring them to take the tests as a condition to completing their respective apprentice programs and because the tests were not job related.[4]
Defendants, in opposition to plaintiffs’ motion, contend that the Court lacks jurisdiction to determine the contempt issue because plaintiffs have filed charges with the EEOC which raise substantially the same issues as those raised by plaintiffs in their motion; that the Court lacks jurisdiction to grant any alternative relief as prayed for by plaintiffs; that they have not violated the consent decree by requiring the plaintiffs to pass the tests as a part of the apprentice program; and that the tests are reasonably related to the jobs performed by plaintiffs.
II. FINDINGS OF FACT
1. Wesley Sam, Jr. and Samuel Crittendon were employed by Monsanto at Texas City, Texas, when they brought this action as named plaintiffs in 1971, and are presently employed by Monsanto as laborers.
2. Crittendon and Sam are members of Local 347, which is a member of the Texas City, Texas Metal Trades Council. The Council serves as bargaining agent for Local 347 with Monsanto. Mr. Crittendon has been a member of Local 347 for 26 or 27 years, and Mr. Sam a member for 23 years.
3. In 1974, after the consent order was entered in this case, Monsanto established painter and pipefitter apprenticeship programs at its Texas City, Texas facility. In accordance with the consent order, openings in the apprenticeships were posted at Monsanto, and employees bid for the position on the basis of seniority. Two positions were open in the painter apprenticeship, and six in the pipefitter apprenticeship.
4. Samuel Crittendon, a black male, bid for the painter apprenticeship program and entered into the program on August 19, 1974. (Deft. Exh. 6). H. D. Wier, a white male, also bid for and entered the program at approximately the same time. Mr. Wier has since completed the program. Mr. Crittendon did not complete the program.
5. Mr. Sam, a black male, bid for and entered the pipefitter apprenticeship program at Monsanto on September 5, 1974. (Deft. Exh. 5). Doris Robinson, a black male, one Mexican-American male, and three white males also entered the program about that time. Mr. Sam is the only person of this group who did not complete the apprenticeship.
6. Four other blacks bid for and entered apprenticeships at Monsanto in other fields about the same time. Three blacks, Messrs. Mouthon, Green and one other, entered the boilermaker apprenticeship and Mr. Harold James entered the machinist apprenticeship *702 programs. Mr. Mouthon was the only black of this group to complete his apprenticeship. There is no evidence, however, that the reason for the other blacks failing to complete their apprenticeships was the inability to pass the tests administered in conjunction with the programs; nor is there any evidence as to the number of white employees who entered those apprenticeships.
7. In summary, of the seven black employees who entered apprenticeships under the bid procedure in 1974, only two successfully completed their apprenticeships. All of the whites who entered the apprentice programs completed their apprenticeships. However, except for the pipefitter and painter apprenticeships, the Court has no comparative evidence indicating the number of whites who completed their apprenticeships as compared to the number of blacks who did not complete their apprenticeships. With respect to the pipefitter apprenticeships, three of the apprentices were minorities and three were not. Only one minority failed to complete the apprenticeship. With respect to the painter apprenticeships, one apprentice was black and one was white; the black failed to complete the program.
8. Prior to 1974, unions in the individual crafts provided their own apprenticeships, and apprentices were selected for the positions irrespective of seniority. Once in the program, apprentices were required to take and pass on-the-job tests and related instruction. In the early 1950’s, related instruction consisted of correspondence courses offered by “ACS” in specific craft knowledge. These courses were discontinued in the late 1950’s because Monsanto and the Council considered the tests outdated and insufficient for their purposes. Texas City High School took over the related instruction in the late 1950’s and continued with it through most of the 1960’s. When the College of the Mainland opened in about 1969, the college began to offer the related instruction and continues to do so today.
9. Although the Articles of Agreement between Monsanto and the Council have provided that Monsanto could offer apprenticeships in painting and pipefitting, Monsanto did not offer apprenticeships in these crafts until 1974. Plaintiffs Sam and Crittendon were among the first employees to enter these apprenticeships.
10. The substance of the training and the requirements for completion of these apprenticeships are set forth in the May 1973-1975 “Articles of Agreement Between Monsanto Company and the Texas City, Texas Metal Trades Council,” Exhibit D, “Maintenance Apprenticeship Standards,” pages 68 through 84. Each apprentice must sign an “Apprentice Agreement” (Deft. Exhs. 5 and 6); successfully complete on-the-job academic and practical training; and successfully complete “related instructions.”
11. On-the-job training consists, of 8,000 hours of training in specific areas of craft knowledge and testing over these areas administered jointly by Monsanto and the union through a craft apprentice representative. These “on-the-job” tests are drafted by the apprentice representative and the craft supervisor to cover areas of instruction received over the previous six months of training. Tests are given every six months because the apprenticeship, designed to last four years, is divided into eight levels of training, each lasting approximately six months. Apprentices must pass these tests before advancing to the next level of training. (Deft. Exh. 36, p. 81). Should an apprentice fail a test, he or she may be retested within 30 days. Failure of the second examination, however, results in termination from the apprenticeship. (Deft. Exh. 36, p. 81). These tests have not been “validated.” [5]
*703 12. In addition to on-the-job training, apprentices are required to successfully complete 144 hours of related instruction in such courses as apprentice math, chemistry, blueprint reading, and craft knowledge. Apprentices are also tested over these courses, and the College of the Mainland at Texas City offered the courses during plaintiffs’ apprenticeships. These tests have not been validated.
13. Prior to beginning related instruction in the fall of 1974, plaintiffs Sam and Crittendon, together with four other new black apprentices, were given diagnostic tests by Monsanto to determine their ability in math. These tests in no way affected the status of these apprentices in their respective apprenticeships, but were administered only to determine the type of math classes in which the apprentices should be placed, i.e., advanced, intermediate, etc. Since these apprentices were weak in math, they were placed in a pre-apprentice or basic mathematics course at the college. Each of the apprentices failed the course, and the college advised Monsanto that none of the six apprentices were capable of advancing into apprentice math.
14. Monsanto and the Council then requested the college to make recommendations with respect to how the apprentices could complete apprentice math by January of 1976. The College of the Mainland tested the apprentices, and upon determining that the apprentices had second to fifth grade math knowledge, recommended that the apprentices attend courses in remedial mathematics and English[6] during the spring 1975 semester and take the apprentice math course in the fall 1975 semester.
15. The college provided these courses four nights a week in the spring semester of 1975, and plaintiffs Sam and Crittendon attended one night a week. (Deft. Exhs. 11 and 19).
16. In the fall of 1975, Sam and Crittendon were enrolled in apprentice math at the college. Additionally, plaintiffs were informed prior to attending the fall semester that they had to pass the math course in order to stay in their apprenticeships. (Deft. Exhs. 14, 21, 26 and 28).
17. Although math is not as important in the painter craft as it is in the pipefitter craft, math is important to both crafts. A painter must be able to compute square feet, yardage and width, and determine the proper mixture for specific paints and types of pipe. A pipefitter must have a greater knowledge of math than a painter, be able to calculate offsets, takeoffs and bends, and interpret and sketch blueprints. Without question, some knowledge of basic mathematics is required for both crafts.
18. In an effort to further assist the plaintiffs and other apprentices with passing the related math instruction at the college, Monsanto employed an instructor to tutor the apprentices at the plant. Classes began August 25, 1975 and were held three days a week between 3:30 p. m. and 5:30 p. m., one hour of which was on company time, the other on the apprentice’s time. This had never been done before.
19. Wesley Sam, Jr. failed the math test given by the College of the Mainland on *704 December 30, 1976. His score was 26. He was retested after 30 days in accordance with the provisions of the Articles of Agreement but failed the second test. His score was 62. (Deft. Exh. 32). As a result of failing the related instruction in apprentice math, Wesley Sam’s apprenticeship was terminated March *29, 1976. (Deft. Exh. 30).
20. Mr. Sam received no complaints about the quality of his work on the job during his apprenticeship, and he passed the “on-the-job” tests administered by Monsanto and the union.
21. Samuel Crittendon' failed to complete the related instruction in math. He did not attend classes in December or take the December 30 examination. Additionally, Mr. Crittendon failed the third level on-the-job test given on December 1, 1975. (Deft. Exh. 13). His score was 35. After Crittendon failed the third level test, he went on vacation. However, on his return and approximately two days prior to the retest, the painter supervisor discussed the questions and answers with him. Mr. Crittendon then took the same test on May 1, 1976. His score on that test was 30 (Deft. Exh. 25). As a result of failing to pass the third level on-the-job test and his failure to complete the related instruction at the college, Crittendon’s apprenticeship was terminated.[7] Even if Mr. Crittendon had successfully completed the related instruction at the college, his failing the on-the-job tests would have resulted in his termination from the apprenticeship.
22. The on-the-job test failed by Crittendon was drafted by the union craft apprentice representative, O. M. Watkins, and the painter supervisor, Tom H. Glover. They established a grade of 70 as passing and each of the questions on the test was related to work assignments plaintiff had received at that level of training.
23. Prior to terminating Messrs. Crittendon’s and Sam’s apprenticeships, Monsanto and the Council attempted to assist them in completing their apprentices. Several things were done which had not been done previously: (1) remedial training was provided in the spring of 1975; (2) Monsanto and the Council extended the deadline for passing apprentice math from January of 1975 to January of 1976; (3) a tutor was provided at the plant on company time; and (4) Monsanto and the Council, through their employees and members, made a sincere effort to provide personal assistance to the plaintiffs.
24. There is no evidence of any purposeful or intentional racial discrimination, or that race was a factor in the termination of plaintiffs from their apprenticeships. In fact, Mr. Crittendon stated that he did not believe that he was discriminated against on account of his race.
25. There is no evidence that white apprentices in the painter and pipefitter apprenticeships at Monsanto were treated any differently than plaintiffs; specifically, there was no evidence that white employees were not required to take and pass the same tests plaintiffs were required to take and pass.
26. Furthermore, the evidence is insufficient to support a finding that the tests had a significantly disproportionate impact upon blacks, as compared to whites, at Monsanto.
27. The Court takes judicial notice of plaintiffs’ original complaint (Ptf. Exh. 1) and this Court’s consent order entered in this case on May 12, 1975 (Ptf. Exh. 2).
CONCLUSIONS OF LAW
1. Defendant Monsanto has raised the issue of whether this Court has jurisdiction to decide the issues raised by plaintiffs in their motion for contempt, since plaintiffs have filed charges with the EEOC which raise substantially the same issues. Monsanto argues that this Court is without jurisdiction to decide the issues because the EEOC has exclusive jurisdiction over them. The Court does not agree.
*705 Certainly, this Court has jurisdiction to enforce its decree, see Youngblood v. Dalzell, 568 F.2d 506 (6th Cir. 1979); Cook v. Ochsner Foundation Hospital, 559 F.2d 270 (5th Cir. 1977); Louisiana Educational Association v. Richland Parish School Board, 421 F.Supp. 973 (W.D.La.1976); and consider those issues addressed in the decree. Therefore, the question presented is whether the consent decree addresses the issues raised by plaintiffs in their motion. Whether identical issues have been raised by charges filed with the EEOC is immaterial. If the issues raised by plaintiffs in their motion are covered by this Court’s consent decree, the Court may consider them and order compliance with its decree. If the issues are not covered by the decree, the Court may not consider them. In this respect, perhaps defendants have overstated their position. The EEOC would have exclusive jurisdiction over issues which the consent decree does not cover. However, in this case, the Court concludes that the consent decree covers the issues raised by plaintiffs in their motion for contempt. Therefore, the Court will address those issues.
The Court will not, however, grant any relief which the consent decree does not specifically require. Any prayer by plaintiffs for alternative relief will be denied.
2. Plaintiffs contend the administration of the tests in connection with their apprenticeships violates § III(c) of the consent decree. Section III(c) specifically provides that “job related” tests may be administered in connection with the apprentice programs at Monsanto so long as persons similarly situated are required to take the same tests without regard to their race. The evidence showed that the articles of agreement specifically require apprentices in the pipefitter and painter apprenticeships to take and pass tests on the job and in connection with related instruction. (Findings of Fact Nos. 10, 11, 12). The evidence further showed that these tests were administered to all apprentices in the pipefitter and painter apprenticeships regardless of their race. (Finding of Fact No. 25). Therefore, the Court concludes that Monsanto and the Council have not violated § III(c) of the decree in administering such tests.
3. Plaintiffs also contend that the tests violate § III(c) of the decree because they are not “job-related.” By their assertion that the tests are not job related, plaintiffs state a “disparate impact” claim. In order to prevail upon their disparate impact claim under Title VII, plaintiffs have the initial burden of establishing a prima facie case by showing that the tests disqualify blacks in a significantly disproportionate number. Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Smith v. Olin Chemical Corp., 555 F.2d 1283 (5th Cir. 1977). Once it is shown that the tests are discriminatory in effect, the employer must meet the burden of showing that the tests are job related. Griggs v. Duke Power Co., supra; Albemarle Paper Co. v. Moody, supra. A test may be shown to be job related only if the employer can demonstrate a manifest relationship between successful performance on the test and successful performance on the job. See Washington v. Davis, supra; United States v. Georgia Power Co., 474 F.2d 906, 912-18 (5th Cir. 1973); Ensley Branch of N.A.A.C.P. v. Seibels, 616 F.2d 812 (5th Cir. 1980). As the Supreme Court stated in Griggs v. Duke Power Co., “The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.” 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164. If the employer proves that the challenged tests are job related, the plaintiff may then show that other selection devices without a similarly discriminatory effect would accomplish the business purpose advanced or accomplish it equally as well. Albemarle Paper Co. v. Moody, 422 U.S. at 425, 95 S.Ct. at 2275, 45 L.Ed.2d at *706 301; Watkins v. Scott Paper Co., 530 F.2d 1159, 1181 (5th Cir. 1976), cert. denied, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139.
4. Plaintiffs failed to prove a prima facie case. On the basis of the evidence presented, the Court cannot conclude that the test operated to disqualify blacks in a significantly discriminatory pattern. (Finding of Fact No. 26). In the pipefitter apprenticeship, one black successfully completed the apprenticeship and one did not. (Finding of Fact No. 5). Similarly, in the painter apprenticeship program, where one white and one black were admitted, the one black failed to complete the program. (Finding of Fact No. 4). With respect to the other apprenticeships, the evidence wholly failed to show any meaningful comparative evidence between blacks and whites in the apprenticeship programs. (Findings of Fact Nos. 6 and 7).
5. The missing ingredient in the proof here was the necessary showing of discrimination. Since plaintiffs have failed to make a prima facie case, the Court need not discuss the question of whether the tests were job related.[8]
6. When § 1981 is used as a parallel basis for relief with Title VII against disparate impact in employment, proof of unlawfully discriminatory purpose is necessary. Washington v. Davis, supra. Plaintiffs have failed to prove that the tests were administered by the defendants with an unlawfully discriminatory purpose. (Finding of Fact No. 24). Therefore, the Court concludes that plaintiffs have failed to prove any violation of § 1981.
7. Plaintiffs also contend that the testing violates Section II of the decree. (See fn. 4). Essentially, this provision requires no more than compliance with the law, which is required of every employer. Because the provision does not “set forth in specific detail an unequivocal command,” Matter of Baum, 606 F.2d 592, 593 (5th Cir. 1979) it cannot support a finding of contempt.
8. Defendants have moved for attorneys fees as prevailing parties under the Civil Rights Attorney’s Fees Act of 1976, 42 U.S.C. § 1988. Whether attorneys fees may be awarded to a defendant who successfully defends against a motion for contempt in a civil rights case need not be decided. See, Cook v. Ochsner Foundation Hospital, 559 F.2d at 272 n.6. Even if attorneys fees could be awarded, the Court concludes that this case is not so frivolous, unreasonable or without foundation as to warrant an award of attorneys fees to the defendants. Christianburg Garment Co. v. Equal Employment Opportunity Commission, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).
In the event any of the foregoing findings of fact also constitute conclusions of law, they are adopted as such. In the event any of the foregoing conclusions of law also constitute findings of fact, they are adopted as such.

. Local 968 and Local 347 were dismissed on May 3, 1972, pursuant to plaintiffs’ motion to dismiss.

. The consent decree provided that the action was remanded to the inactive docket of the court for a period of three years and that “at the conclusion of three (3) years from the entry of [the] Order the action shall automatically be dismissed unless prior thereto Plaintiffs submit evidence persuasive to the Court that the Company or Council have, since the date of [the] Order, engaged in conduct or practice which violated the terms of [the] Consent Order.”

. Plaintiff Sanders was not present and no evidence was presented in his behalf. Accordingly, allegations in the motion for contempt or alternative relief which relate only to him will not be discussed.

. Section II provides:
With respect to any member of the Affected Class, the Company and Council, their officers, agents, employees and all persons in active concert or participation with them, shall not refuse to hire, transfer or promote because of race or color, and will comply with the provisions of the said Title VII of the Civil Rights (Act) (sic) of 1964 and with the provisions of the said § 1981 of the Civil Rights Act of 1866. Section III(c) provides in pertinent part:
It shall not be a requirement for any member of the Affected Class to take any written aptitude, psychological or intelligence tests as a factor for transfer to any job classification. Nothing contained herein shall be construed as prohibiting (1) the administration of such tests for the purpose of validation studies, or (2) the administration of job related tests for appropriate purposes, such as, among others, qualifying under the apprentice programs; provided, however, that members of the Affected Class shall not be required to take any job related test which is not also required of Caucasians for the same purpose.

. “Validation” is the process of determining whether a selection device is sufficiently job-related to comply with the requirements of Title VII. See Uniform Guidelines on Employee Selection Procedure [hereinafter referred to as Uniform Guidelines], 43 Fed.Reg. 38290, 38291 (August 25, 1978). There are three basic methods of validation: “ ‘criterion’ validity (demonstrated by identifying criteria that indicate successful job performance and then correlating *703 test scores and the criteria so identified); ‘construct’ validity (demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and ‘content’ validity (demonstrated by tests whose content closely approximate tasks to be performed on the job by the applicant).” Washington v. Davis, 426 U.S. 229, 247, 96 S.Ct. 204, 2051, 48 L.Ed.2d 597, 612 n.13 (1976); see uniform Guidelines, § 5, 43 Fed.Reg. at 38298.
The Uniform Guidelines in this footnote were adopted on August 25, 1978, by the Equal Employment Opportunity Commission (EEOC), the Civil Service Commission (CSC), the Department of Labor (DOL), and the Department of Justice (DOJ) and are codified in the 1979 editions of 29 C.F.R. § 1607 (EEOC); 5 C.F.R. § 300.103(c) (CSC); 41 C.F.R. § 60-3 (DOL); and 28 C.F.R. § 50.14 (DOJ). The Guidelines, effective September 25, 1978, supersede the guidelines on employee selection procedure previously issued by the EEOC and the DOJ (the DOJ Guidelines were issued jointly with the DOL and CSC).

. English was taught because the college concluded that part of the problem with math was due to a difficulty in reading the problems.

. Mr. Crittendon had difficulty with the on-the-job tests from the start. He failed his first level test with a grade of 52.5 but was retested orally and passed with a score of 75. He passed his second level test with a score of 70.

. The Court notes that the tests in question have not been validated. Non-validated tests are not violative of Title VII per se. Title VII comes into play only when such practices result in discrimination. At that point, the burden of producing evidence shifts to the employer, who must offer satisfactory evidence of the validity of the tests. Hester v. Southern Railway Co., 497 F.2d 1374, 1381 (5th Cir. 1974). Evidence of a test’s validity should consist of empirical data compiled in a manner which conforms with the EEOC Guidelines on Employee Selection Procedures, 29 C.F'.R. § 1607. These guidelines, while not binding on the courts, are entitled to great deference, Albemarle Paper Co. v. Moody, supra, Ensley Branch of N.A.A.C.P. v. Seibels, supra; and should be followed absent a showing that some cogent reason exists for noncompliance. United States v. Georgia Power Co., supra at 913.